1   Scott A. Kamber (*pro hac vice*)
    skamber@kamberlaw.com
2   David A. Stampley (*pro hac vice*)
    dstampley@kamberlaw.com
3   Grace Parasmo
    gparasmo@kamberlaw.com
4   KamberLaw, LLC
    100 Wall Street,  23rd Floor
5   New York, New York 10005
    Telephone:   (212) 920-3072
6   Facsimile:    (212) 920-3081

7   Deborah Kravitz (SBN 275661)
    dkravitz@kamberlaw.com
8   KamberLaw LLP
    141 North Street
9   Healdsburg, CA 95448
    Telephone:   (707) 820-4247
10  Facsimile:    (212) 920-3081

11  *Interim Class Counsel*
    (Additional counsel listed on signature page)

12

13

14              UNITED STATES DISTRICT COURT

15             NORTHERN DISTRICT OF CALIFORNIA

16                   SAN JOSE DIVISION

17  IN RE iPHONE APPLICATION          )   Case No.        CV-10-5878-LHK (PSG)
18  LITIGATION                        )
                                      )   **PLAINTIFFS' MEMORANDUM OF**
19                                    )   **LAW IN OPPOSITION TO**
                                      )   **DEFENDANTS' MOTIONS TO**
20                                    )   **DISMISS**
                                      )
21                                    )   Date:   September 1, 2011
                                      )   Time:  1:30 p.m.
22                                    )   Judge: Hon. Lucy H. Koh
                                      )
23                                    )
                                      )
24                                    )
                                      )
25                                    )
                                      )
26  _____   )

27

28

1

2

# <u>TABLE OF CONTENTS</u>

3

PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTIONS TO DISMISS ....................................................................................1

ISSUES PRESENTED...........................................................................................1

INTRODUCTION ..................................................................................................1

STATEMENT OF FACTS ALLEGED....................................................................2

ARGUMENT ..........................................................................................................5

     I.     PLAINTIFFS HAVE ALLEGED INJURY SUFFICIENT TO CONFER
           STANDING UNDER ARTICLE III .........................................................5

           A.     Apple Ignores Allegations of the Complaint That Satisfy Article III
                  Standing ........................................................................................7

           B.     Plaintiffs' Injury is not Too Speculative and is Directly Traceable to
                  Apple's Misconduct. ....................................................................10

     II.    THE APP DEVELOPERS ARE NOT NECESSARY PARTIES .........................11

           A.     The Apps Are Not Required Parties Because They Have No Interest
                  In The Litigation And The Court Can Accord Complete Relief
                  Among The Existing Parties .........................................................12

                 1.     The Apps Have Not Claimed Nor Can They Claim a Legally
                        Protected Interest Relating to the Subject of the Action................12

                 2.     Complete Relief Can Be Granted Between the Existing Parties
                        and in the Absence of the Apps .....................................................15

            B.     The Court Can Proceed In Equity And Good Conscience Without
                   Joinder Of The Apps ...................................................................16

     III.   APPLE'S TERMS OF SERVICE DO NOT BAR PLAINTIFFS' CLAIMS........17

           A.     Apple's "Disclaimer" Is an Unconscionable and Unenforceable
                   Allocation of Risk Among Parties of Unequal Bargaining Power. ..........18

            B.     Apple Cannot Disclaim Its Liability for Its Own Negligence .................19

            C.     Apple Cannot Disclaim Liability for Active Negligence In
                   Administering Its App Store. .......................................................21

     IV.   PLAINTIFFS HAVE STATED PLAUSIBLE CLAIMS AGAINST THE
           TRACKING DEFENDANTS UNDER FED. R. CIV. P. 8(A)............................22

     V.    PLAINTIFFS HAVE STATED CLAIMS AGAINST ALL DEFENDANTS
           UNDER THE COMPUTER FRAUD AND ABUSE ACT...................................24

A.  CFAA Is Not Limited To Targeting Criminal Hackers ...........................24

B.  Plaintiffs Adequately Allege That Defendants Violated the CFAA..........25

1.  Plaintiffs Have Adequately Alleged "Damage *Or* Loss" Under
The CFAA...................................................................................26

2.  The Tracking Defendants accessed Plaintiffs' iDevices
"without authorization" or "exceeded authorized access" to
those devices ...........................................................................31

VI.  PLAINTIFFS HAVE STATED CLAIMS AGAINST ALL DEFENDANTS
UNDER THE CALIFORNIA'S COMPUTER CRIME LAW ("CCL")...............33

A.  Plaintiffs Have Adequately Alleged "Damage Or Loss" Under The
CCL..............................................................................................33

B.  Plaintiffs Have Adequately Alleged That The Tracking Defendants
Accessed Their iDevices "Without Permission" .......................................33

C.  Plaintiffs Sufficiently Allege a Claim for Violation of Section
502(c)(8) ..........................................................................................35

VII.  PLAINTIFFS HAVE PROPERLY STATED A CLAIM UNDER THE UCL .....35

A.  Legal Standard ...................................................................................35

B.  Plaintiffs Have Standing Under the UCL ................................................36

C.  Plaintiffs Have Properly Pled Each Prong Of The UCL............................37

VIII.  PLAINTIFFS HAVE PROPERLY STATED A CLAIM UNDER THE
CLRA ...................................................................................................40

IX.  PLAINTIFFS HAVE PROPERLY STATED A CLAIM OF TRESPASS TO
CHATTELS. ..........................................................................................41

X.  PLAINTIFFS HAVE PROPERLY ALLEGED A RIGHT TO THE RELIEF
OF UNJUST ENRICHMENT ...................................................................42

XI.  PLAINTIFFS SUFFICIENTLY PLEAD NEGLIGENCE AGAINST APPLE ...43

A.  Apple Has a Duty of Reasonable Care that Arises Independent of Its
Contracts ............................................................................................43

1.  Duty to Perform Contract with Care and Skill.............................44

2.  Duty to Use Ordinary Care to Avoid Harm ...................................45

3.  Apple Undertook a Duty and Had a Duty to Act with
Reasonable Care.........................................................................46

4.  Apple Had a Special Relationship with Plaintiffs..........................47

B.  Apple Breached its Standard of Care ........................................................48

C.      Plaintiffs Have Established Harm ................................................48

XII.   DAMAGES ARE NOT PRECLUDED BY THE SO-CALLED ECONOMIC
LOSS DOCTRINE.................................................................................48

XIII.   APPLE BREACHED ITS DUTY OF GOOD FAITH AND FAIR DEALING....50

CONCLUSION..................................................................................................................50

1

2

## **TABLE OF AUTHORITIES**

3

**Page(s)**

**FEDERAL CASES**

4

5

*Accuimage Diagnostics Corp v. Terarecon, Inc.*, 260 F.Supp.2d 941, 958 (N.D. Cal. 2003) ......43

6

*Am. Online, Inc. v. Nat'l Health Care Discount, Inc.*, 121 F.Supp. 2d 1255, 1277 (N.D. Iowa 2000) ....................................................................................................................................41

7

*American Greyhound Racing, Inc. v. Hull*, 305 F.3d 1015 (9th Cir. 2002) (Apple Br. at 23-24) .....................................................................................................................................14

8

9

*Ashcroft v. Iqbal*, -- U.S. --, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009)...........................23

10

*Augustine v. U.S.*, 704 F.2d 1074, 1077 (9th Cir. 1983)................................................................5

11

*Avila v. Countrywide Home Loans*, 2010 WL 5071714, at *6 (N.D. Cal. Dec 7, 2010)..............39

12

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 583, 127 S. Ct. 1955, 1981, 167 L. Ed. 2d 929 (2007) ........................................................................................................................................23

13

14

*Birdsong v. Apple, Inc.*, 590 F.3d 955 (9th Cir. 2009) (Apple Br. at 9-10,TD Br. at 9).................9

15

*Cachil Dehe Band of Wintun Indians v. Cal.*, 536 F.3d 1034, 1041, *amended by* 547 F.3d 962 (9th Cir. 2008).........................................................................................13, 14, 16

16

17

*Chodos v. W. Publ'g Co.*, 292 F.3d 992, 996-97 (9th Cir. 2002) ................................................50

*Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 969 & 975 (9th Cir. 2003) ...10

18

*Clinton v. Babbitt*, 180 F.3d 1081 (9th Cir. 1999) ......................................................................14

19

*CompuServe Inc. v. Cyber Promotions, Inc.*, 962 F.Supp. 1015, 1021-24 (S.D. Ohio 1997) .......42

20

*Council of Ins. Agents & Brokers v. Molasky-Arman,* 522 F.3d 925, 932 (9th Cir. 2008)..............6

21

*Craigslist, Inc. v. Naturemarket, Inc.*, 694 F.Supp.2d 1039, 1056-57 (N.D. Cal. 2010)..............26

22

*Danvers Motor Co., Inc. v. Ford Motor Co.*, 432 F.3d 286, 294 (3d Cir. 2005)...........................6

23

*Davis v. Passman,* 442 U.S. 228, 239 n.18 (1979) .......................................................................7

24

*Disabled Rights Action Comm. v. Las Vegas Events, Inc.* 375 F.3d 861, 881 (9th Cir. 2004) ......................................................................................15, 17

25

26

*Doe 1 v AOL LLC*, 719 F.Supp.2d 1102, 1113-14 (N.D. Cal. 2010)............................................37

27

*Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995)................................................................23

28

*eBay Inc. v. Bidder's Edge, Inc.*, 100 F.Supp. 2d 1058, 1064-73 (N.D. Cal. 2000)......................41

*Erickson v. Pardus*, 551 U.S. 89, 127 S. Ct. 2197, 2200 (2007) ....................................23

*Expert Janitorial LLC v. Williams*, No. 03:09-CV-283, 2010 WL 908740, at *8 (E.D. Tenn. Mar. 12, 2010)........................................................................................27

*Facebook, Inc. v. Power Ventures, Inc.*, No. C 08-05780, 2010 WL 3291750, at *11 (N.D. Cal. July 20, 2010) ....................................................................33

*Ferrington v. McAfee, Inc.*, 10-CV-01455-LHK, 2010 WL 3910169 (N.D. Cal. Oct. 5, 2010)....................................17, 42

*Ferrington v. McAfee, Inc.*, No. 10-CV-01455-LHK, 2010 U.S. Dist. LEXIS 106600 (N.D. Cal. October 5, 2010)........................................................................40

*First Fin. Ins. Co. v. Butler Chamberlain-Nielsen Ranch Ltd.*, No. 10-2004, 2010 WL 4502151, at *2 (N.D. Cal. Nov. 2, 2010) (Armstrong, J.) ......................................16

*Friends of Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 183–185 (2000) ............................................................................8

*Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir. 1997) ..................................23

*Guerrero v. Gates*, 442 F.3d 697, 703 (9th Cir. 2006) ....................................23

*Hepting v. AT & T Corp.*, 439 F.Supp.2d 974, 1000 (N.D. Cal. 2006) ....................................2, 11

*Hotmail Corp. v. Van$ Money Pie, Inc.*, No. C98-20064 JW, 1998 WL 388389, *7 (N.D. Cal. Apr. 16, 1998) ............................................................................41

*I.M.S. Inquiry Mgmt. Sys., Ltd. V. Berkshire Info. Sys., Inc.*, 307 F. Supp. 2d 21, 525 (S.D.N.Y. 2005) ........................................................................27

*In re Apple & ATTM Antitrust Litig.*, 596 F. Supp.2d 1288 (N.D. Cal. 2008) ............................30

*In re Apple & ATTM Antitrust Litig.*, No. C 07-05152, 2010 WL 3521965, at *7 (N.D. Cal. July 8, 2010)....................................................................31

*In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F.Supp.2d 1011, 1019 (N.D. Cal. 2010) .....24

*In Re DoubleClick Privacy Litigation*, 154 F.Supp. 2d 497 (S.D.N.Y. 2001) ................................9, 29

*In re Facebook Privacy Litig.*, No. 10-02389, 2011 WL 2039995, at *4 (N.D. Cal. May 12, 2011) (Ware, J.) ........................................................6, 33, 34, 35

*In re Providian Fin. Corp. ERISA Litig.*, 2002 WL 31785044, at *1 (N.D. Cal. Nov. 14, 2002) ........................................................................24

*In re Toys R Us, Inc., Privacy Litig.*
00-CV-2746, 2001 WL 34517252 (N.D. Cal. Oct. 9, 2001) .................................................... 29, 30

*In re Wells Fargo Mortg. Lending Discrimination Litig.*, No. 08-1930, 2009 WL 2473684, at
*3 (N.D. Cal. Aug. 11, 2009) (Chesney, J.)..............................................................................13

*Ingle v. Circuit City Stores, Inc.*, 279 F.3d 889 (9th Cir 2003) ......................................................18

*Jenkins v. McKeithen*, 395 U.S. 411, 423 (1969) ............................................................................6

*Kinderstart.com, LLC v. Google, Inc.*, No. C06-2057 JF (RS), 2006 WL 3246596, at *12
(N.D. Cal. July 13, 2006)........................................................................................................50

*La Court v. Specific Media, Inc.,* No. 10-1256, 2011 WL 2473399 (C.D. Cal. Apr. 28, 2011)
(Wu, J.)......................................................................................................................................9

*Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1038 (9th Cir. 2002)..............................................23

*Makah Indian Tribe v. Verity*, 910 F.2d 555, 558 (9th Cir. 1990).................................................16

*Meaunrit v. ConAgra Foods Inc.*, No. 09-2220, 2010 WL 2867393, at *4 (N.D. Cal. July 20,
2010) (Breyer, J.) ......................................................................................................................7

*Metro. Creditors' Trust v. Pricewaterhousecoopers, LLP*, 463 F.Supp.2d 1193, 1197 (E.D.
Wash. 2006) .............................................................................................................................21

*Mortensen v. Bresnan Communication*, L.L.C., No. CV 10-13-BLG-RFC, 2010 WL
5140454, at *7 (D. Mont. Dec. 13, 2010) ..............................................................................28

*Nat'l Wildlife Fed'n v. FEMA*, 345 F.Supp.2d 1151, 1162-63 (W.D. Wash. 2004).....................10

*Ocean Advocates v. U.S. Army Corps of Eng'rs*, 361 F.3d 1108, 1120 (9th Cir. 2004),
*amended by* 402 F.3d 846 (9th Cir. 2005) .............................................................................10

*Oculus Innovative Scis., Inc. v. Nofil Corp.*, No. 06-01686, 2007 WL 205068, at *2 (N.D.
Cal. Jan. 25, 2007) (Illston, J.)........................................................................................12, 13

*Oestreicher v. Alienware Corp.*, 544 F.Supp.2d 964, 975 (N.D. Cal. 2008)................................43

*Pac. Aerospace & Electronics, Inc. v. Taylor*, 295 F.Supp.2d 1188, 1196 (E.D. Wash. 2003)....24

*Parks School of Business, Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995) ......................23

*Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir.1998) ..............................................................17

*PNG Telecomm., Inc. v. Pac-West Telecomm, Inc.*, No. 10-1164, 2010 WL 3186195 at *2-3
(E.D. Cal. Aug. 11, 2010) (Damrell, J.)....................................................................................5

*Register.com, Inc. v. Verio, Inc.*, 126 F.Supp. 2d 238, 250 (S.D.N.Y. 2000), aff'd, 356 F.3d
393 (2d Cir. 2004)....................................................................................................................41

*Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404-05 (2d Cir. 2004) ........................41

*Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986) ...........43

*Shamrock Foods Co. v. Gast*, 535 F. Supp. 2d 926, 966 (D. Ariz. 2008) ...............................31, 33

*SOAProjects Inc. v. SCM Microsystems, Inc.*, 2010 WL 5069832 at *9-10 (N.D. Ca. Dec. 7, 2010) (Koh, J.) ........................................................................................42

*Southwest Airlines Co. v. Farechase, Inc.*, 318 F.Supp. 2d 435, 442 (N.D. Tex. 2004) ..............41

*Starr v. Sony BMG Music*, 592 F.3d 314, 325 (2nd Cir. 2010) ........................................24

*State Analysis, Inc. v. Am. Fin. Servs. Assoc.*, No. 1:08cv1333, 2009 WL 855793, *7 (E.D. Va. Mar. 31, 2009) ........................................................................................41

*SuccessFactors, Inc. v. Softscape, Inc.,* 544 F.Supp.2d 975, 980-81 (N.D. Cal. 2008)................28

*Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1152-53 (9th Cir. 2008) ....................39

*Synopsys, Inc. v. Magma Design Automation, Inc.*, No. 04-3923, 2006 WL 825277, at *3 (N.D. Cal. Mar. 30, 2006) (Chesney, J.) ........................................................13

*Thornhill Publ'g Co. v. General Tel. & Elec. Corp.*, 594 F.2d 730, 733 (9th Cir.1979) ................5

*U.S. v. Hays*, 515 U.S. 737 (1995) (Apple Br. at 5) ....................................................7, 8

*United States v. Bowen*, 172 F.3d 682, 688-89 (9th Cir. 1999) ......................................13

*United States v. City of Redwood City*, 640 F.2d 963, 966 (9th Cir. 1981) ..................................22

## CALIFORNIA CASES

*24 Hour Fitness, Inc. v. Sup. Ct.*, 66 Cal.App.4th 1199, 1213 (1998)...........................18

*A & M Produce Co. v. FMC Corp.*, 135 Cal.App.3d 473, 492 (1982) ...........................18

*Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal.4th 503, 515 (1994) ............................44

*Arias v. Super. Ct.*, 46 Cal.4th 969, 977-78 (2009) ........................................36

*Belton v. Comcast Cable Holdings, LLC*, 151 Cal.App.4th 1224, 1241 (2007)..........................38

*Bolter v. Sup. Ct.,* 87 Cal.App.4th 900 (2001)........................................................18

*Camacho v. Auto Club of So. Cal.*, 142 Cal.App.4th 1394, 1403 (2006) ...............................38, 39

*CAZA Drilling (California), Inc. v. TEG Oil & Gas U.S.A., Inc.* 142 Cal.App.4th 453 (2006) ........................................................................................21

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal.4th 163, 180 (1999).........................37

*Comm. on Children's Television, Inc. v. Gen. Foods Corp.*, 35 Cal.3d 197, 211 (1983) ..............36

*Day v. A T & T Corp.*, 63 Cal.App.4th 325, 332 (1998)......................................................36

*Delgado v. Trax Bar & Grill*, 36 Cal.4th 224, 250 (2005) ......................................46, 47

*Erlich v. Menezes*, 21 Cal.4th 543 (1999)...........................................................45, 46

*Fletcher v. Sec. Pac. Nat'l Bank*, 23 Cal.3d 442, 453 (1979) .............................36, 37

*Gardner v. Downtown Porsche Audi*, 180 Cal.App.3d 713, 716-17 (1986).........................20

*Gavin W. v. YMCA of Metro. Los Angeles,* 106 Cal.App.4th 662, 675 (2003).........................20

*Henrioulle v. Marin Ventures, Inc.,* 20 Cal.3d 512, 519 (1978)......................................20

*Ilkhchooyi v. Best*, 37 Cal.App.4th 395, 409-410 (1995) .............................................18

*In re Tobacco II Cases*, 46 Cal.4th 298, 312 (2009).................................................36

*In re Toyota Motor Corp*. (No. 8:10-ml-02151-JVS-FMO) ..............................................23

*Kinney v. United HealthCare Services, Inc.*, 70 Cal.App.4th 1322 (1999).........................18

*Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 1148 (2003) .......................36

*Kwikset Corp. v. Super. Ct.*, 51 Cal.4th 310 (2011) ...........................................36, 37

*McCarn v. Pac. Bell Directory,* 3 Cal.App.4th 173, 180 (1992) ...................................21

*Moreno v. Sanchez,* 106 Cal.App.4th 1415, 1435 (2003)..........................................44

*N. Am. Chemical Co. v. Sup. Ct.*, 59 Cal.App.4th 764, 774 (1997)..........................44, 49

*Neubauer v. Circuit City Stores, Inc.,* G032942, 2004 WL 2861674 (Cal. Ct. App. Dec. 14, 2004) .....................................................................................46

*Nunes Turfgrass, Inc. v. Vaughan-Jacklin Seed Co.*, 200 Cal.App.3d 1518, 1538 (1988) ..........22

*O'Hare v. Mun. Res. Consultants*, 107 Cal.App.4th 267 (2003) ....................................18

*Pelletier v. Alameda Yacht Harbor*, 188 Cal.App.3d 1551, 1555 (1986)............................20

*Robinson Helicopter Co., Inc. v. Dana Corp.*, 34 Cal.4th 979, 988 (2004) ........................48

*Samura v. Kaiser Found. Health Plan, Inc.,* 17 Cal.App.4th 1284 (1993) ..........................18

*Schwartz v. Helms Bakery Ltd.,* 67 Cal.2d 232, 238 (1967).......................................46

*State Farm Fire & Cas. Co. v. Super. Ct.*, 45 Cal.App.4th 1093, 1105 (1996)....................36

*Tunkl v. Regents of Univ. of Cal.,* 60 Cal.2d 92, 102 (1963) .......................................................20

*Weirum v. RKO Gen., Inc.,* 15 Cal.3d 40, 46 (1975) ....................................................................45

**FEDERAL: STATUTES, RULES, REGULATIONS, CONSTITUTIONAL PROVISIONS**

18 U.S.C. 1030(g) ..........................................................................................................................25

18 U.S.C. § 1030(a)(2)(C) .............................................................................................................25

18 U.S.C. §§ 1030(a)(5)(A) & (B) .................................................................................................25

18 U.S.C. § 1030(c)(4)(A)(i)(I) .....................................................................................................27

18 U.S.C. § 1030(e)(6) ...................................................................................................................31

18 U.S.C. § 1030(e)(8) ...................................................................................................................26

18 U.S.C. § 1030(e)(11) .................................................................................................................28

18 U.S.C. § 1030(g) ..................................................................................................................26, 27

Fed. R. Civ. P. 8(a) .....................................................................................................................22, 23

Fed.R.Evid. 201(b) .........................................................................................................................21

**OTHER: STATUTES, RULES, REGULATIONS, CONSTITUTIONAL PROVISIONS**

Cal. Civ. Code § 1668 .....................................................................................................................20

Cal. Civ. Code § 1670.5 ..................................................................................................................18

Cal. Civ. Code § 1708 .....................................................................................................................45

Cal. Civ. Code § 1751 .....................................................................................................................22

Cal. Civ. Code § 1760 .....................................................................................................................40

Cal. Civ. Code § 1761(a) .................................................................................................................40

Cal. Civ. Code § 1761(d) .................................................................................................................40

Cal. Civ. Code § 1780(a) .................................................................................................................40

Cal. Civ. Code § 3513 .....................................................................................................................22

Cal. Penal Code § 502(b)(1) ...........................................................................................................35

California Constitution......................................................................................................................39

Article I, Section 1 of the California Constitution ..........................................................................37

California Penal Code section 502(c)(8)...................................................................35

Rule 8...................................................................................................................23

Rule 8(a)'s............................................................................................................24

Rule 9(b)...............................................................................................................36

Rule 9(b)'s............................................................................................................36

Rule 12(b)(1)..........................................................................................................7

Rule 12(b)(6)............................................................................................1, 7, 22, 23

Rule 12(b)(7).........................................................................................................12

Rule 19........................................................................................................... passim

Rule 19(a)...............................................................................................12, 13, 16

Rule 19(a)(1).........................................................................................................12

Rule 19(a)(2).........................................................................................................13

Rule 19(b).......................................................................................................16, 17

**OTHER AUTHORITIES**

Web's Hot New Commodity: Privacy, WSJ.com, February 28, 2011 available at
    http://online.wsj.com/articleSB10001424052748703529004576160764037920274.html. ....26

Charles Alan Wright, Arthur R. Miller, *et al*., *Federal Practice and Procedure* § 3531.4 (3d
    ed. 2011) ........................................................................................................6

Merriam-Webster Dictionary, available at http://www.merriam- webster.com/dictionary/cost ...27

Restatement (Second) of Torts § 315 (1965)..............................................................47

## ISSUES PRESENTED

1.  Whether Plaintiffs have alleged injury sufficient to confer standing under Article III;

2.  Whether it was within Plaintiffs' discretion to not name the App Developers in the Complaint

3.  Whether Apple's self-titled "disclaimer of liability" is a contract of adhesion which is unconscionable and unenforceable; and

4.  Whether Plaintiffs have stated a claim against Defendants for each of the claims alleged in the Complaint sufficient to survive a motion to dismiss under Rule 12(b)(6).

## INTRODUCTION

Apple and the Tracking Defendants seek much more than the dismissal of a complaint, they seek to make it impossible for consumers to assert rights over their own personal information. Through the mischaracterization of the allegations before the Court and a selective reading of existing case law, Apple and the Tracking Defendants seek to fundamentally alter the balance of personal privacy in the world of the Internet and e-commerce. Defendants' efforts to avoid answering for their expressly and properly plead wrongful conduct is without basis and their collective effort to continue the uncompensated and undisclosed exploitation and monetization of consumers' personal information is simply wrong—wrong for the class, and bad for our society.

This case turns a sharp focus on the surreptitious capture and exploitation of Plaintiffs and Class Members' highly personal information by Defendants, without adequate notice to, or consent by, Plaintiffs and Class Members. As a result of Defendants' unauthorized tracking and harvesting of their personal information, Class Members' iDevices have diminished in value and performance, and the resources on their iDevices, such as Internet connectivity, have been improperly consumed. This conduct was directed by the Tracking Defendants and enabled by Apple to serve their particular business purposes to the detriment of the members of the Class.[1]

---

[1] This case is not about—as the Tracking Defendants disingenuously posit—the capture of information by them that is necessary for particular Apps to function. TD Br. at 2. Rather, Plaintiffs and Class members seek redress for the injuries caused by the unlawful and improper collection and exploitation of their personal data that is wholly irrelevant for the functioning of a particular App, but which is highly relevant and valuable to both Defendants and Plaintiffs.

## STATEMENT OF FACTS ALLEGED[2]

**The Sensitive and Personal Nature of the Information Collected By Defendants**

Plaintiffs are consumers who purchased and use Defendant Apple Inc.'s ("Apple") iDevices[3] that use the iOS operating system.  iDevices include iPhones, iPads, and iPod Touch devices. (Compl. ¶¶ 8, & 28-31)[4]. By Apple's design, each one of the iDevices contains identifiers linked to the specific iDevice and consumer.  Identifiers that Apple deploys to various iDevices include: (1) *unique device identifier* (UDID), a number that uniquely identifies the particular iDevice); (2) *International Mobile Subscriber Identity* (IMSI), which reveals the consumer's country and mobile operator and which remains unchanged even when a consumer changes devices (3) *cellphone number*; and (4) *SIM card serial number* (ICCID).  (Compl. ¶ 58).  In addition, by Apple's design, the very use of an iDevice by each Plaintiff and Class member generates a great deal more personal information which is stored on the iDevice, including: (1) *address book*, consisting of names, phone numbers, email addresses, physical addresses, and other contact information entered by the consumer, and also including notes, in which many consumers record their own, sensitive information, such as account and passcode information; (2) *photographs*, which, by default, are stored with dates and GPS locations that identify when and where the photos were taken; (3) *file system*, consisting of the consumer's web search, video viewing history, and all other iDevice data files; (4) *keyboard cache*, consisting of a log of what the consumer typed (including personal and confidential information), designed to be used by the iDevice's auto-complete function. (Compl. ¶ 58). In addition, Apple created a file on the iDevice that maintains an unencrypted log of users' movements, as often as 100 times a day, for up to a

---

[2] The statement of facts is a summary of major allegations of the Complaint and is not a substitute for the fact that Defendants' motions must take *all* facts in the complaint as true.

[3] Apple contends that Plaintiffs' reference to "users," "consumers" and "Plaintiffs" interchangeably in the Complaint defeats standing. (Apple Br. at 9.)  This is form over substance. Plaintiffs have alleged that they purchased and used the iDevices and that Defendants tracked all users in a uniform manner. *See Hepting v. AT & T Corp*., 439 F.Supp.2d 974, 1000 (N.D. Cal. 2006) ("[a]s long as the named plaintiffs were, as they allege, AT & T customers during the relevant time period…the alleged dragnet would have imparted a concrete injury on each of them.").

[4] All references to paragraphs in Plaintiffs' Consolidated Class Action Complaint are herein referred to as "Compl. ¶____."

one-year period, and logged users' geolocations without respect to whether they disabled the iDevice GPS features.  (Compl. ¶ 58(d)). Apple did this by using cell transmitter tower signals to triangulate a user's location and then Apple replicated the file containing such data on any computer with which users synched an iDevice (Compl.¶ 58(d)).  Apple acknowledges that each UDID is globally unique and "personally identifiable" because, if combined with other information, such as other information easily available on the iDevice, it can be used to personally identify a consumer. (Compl. ¶ 60).

**Defendants' Unauthorized Collection And Exploitation of Class Member's Information Assets**

Many apps do more than simply increase the utility of consumers' iDevices by performing services chosen by Plaintiffs and Class members. They come with a built-in, hidden purpose of giving online advertising and web analytics companies access to the storehouse of personal and identifying information on consumers' iDevices. These advertising and analytics companies include Defendants AdMob, Inc. ("AdMob"), Flurry, Inc. ("Flurry"), Mobclix Inc. ("Mobclix"), Pinch Media, Inc. ("Pinch Media"), Traffic Marketplace, Inc. ("Trafficmarketplace"), Millennial Media ("Millennial"), AdMarvel, Inc. ("AdMarvel") and Quattro Wireless, Inc. ("Quattro") (collectively, the "Tracking Defendants"). (Compl. ¶ 62).

When a consumer uses an app, a Tracking Defendant's code enables that defendant to collect personal and identifying information from the consumers' iDevice. (Compl. ¶ 64).  Indeed, the staggering amount of personal information acquired by the Tracking Defendants allows them to track individual consumers across multiple apps, and even correlate consumers' activity across multiple iDevices (when apps are accessed from more than one iDevice).  (Compl. ¶ 67). The Tracking Defendants' collection of Plaintiffs and Class Members' personal information often has nothing whatsoever to do with the functioning of the apps—functionality which would be completely unimpaired without the transmission of data to the Tracking Defendants. (Compl. ¶¶ 68-69).  As a result of the surreptitious nature of the coding and tracking activity, Plaintiffs and Class Members were unable to control, detect, or avoid those practices. (*See* Compl. ¶ 70). Because Plaintiffs and Class Members did not know of Defendants' practices, they were deprived

of the opportunity to choose to not download invasive apps, or to make an informed decision as to whether they wished to consent to share their personal and private information. (Compl. ¶¶ 72, 76, 80, 82, 89, & 90).

**Apple is an Active and Indispensable Player in the Tracking of Plaintiffs and Class Members**

Since Apple first launched its mobile device business, it has maintained tight control over every facet of how the devices work. (Compl. ¶ 1). The responsibility for the complete consumer experience begins with a consumer's purchase of a mobile device, designed and manufactured by Apple, that will only function using Apple's proprietary operating system, iOS. (Compl. ¶ 2). Apple trades on its control of the App Store, claiming to offer only apps it has reviewed and found safe and appropriate. (Compl. ¶¶ 3-5). Apple controls the process for the app development software, the deployment of software in the iOS environment, and has taken concrete actions to make looking behind its wall of control most difficult for researchers let alone consumers. (*See, e.g.,* Compl. ¶¶ 4 & 5).

Yet, Apple has created a secret door in its wall of control to accommodate ad networks and Internet metrics companies, making consumers' personal information available so these companies can track consumers and access their personal information. (Compl. ¶ 6). These companies not only provide an important revenue source for App developers who provide the Apps through the App Store, they also furnish the analytic data used in industry reports that benefit Apple by showing its market leadership, which it so often heralds in its quarterly investor conference calls. (Compl. ¶ 6).

In April of 2010, Apple amended its Developer Agreement to ban Apps from sending data to third-parties except for information directly necessary for the functionality of the App. (Compl. ¶ 48). Apple's revised Developer Agreement provided that "the use of third party software in Your Application to collect and send Device Data to a third party for processing or analysis is expressly prohibited." (Compl. ¶ 48). In the wake of Apple's prohibition against sending user information to third parties, protests erupted from a number of third-party advertising networks and metrics/analytics companies who had been receiving a steady flow of consumer data from iDevices via the Apps. (Compl. ¶ 66). To date, Apple has taken no steps to actually implement its

changed Developer Agreement or enforce it in any meaningful way. (Compl. ¶ 66).

**Plaintiffs and the Class Were Harmed By The Collective Actions of Defendants**

It is not Apple alone—but Apple and the Tracking Defendants together—whose actions directly harmed Plaintiffs and Class Members. Plaintiffs and Class Members consider the information from and about themselves on their iDevices to be personal and private information that they value as an economic asset, which has discernible value in the information marketplace. (Compl. ¶¶ 74 & 91). Because Plaintiffs and Class Members were not informed of, and did not knowingly consent to, the collection, transfer and use of their personal information by Defendants, Plaintiffs and Class Members suffered economic harms detailed throughout the Complaint. (*See e.g.* Compl. ¶¶ 74-91) (lack of proper value-for-value exchanges, undisclosed opportunity costs, devaluation of personal information, loss of the economic value of the information asset).[5]

## ARGUMENT

### I.   PLAINTIFFS HAVE ALLEGED INJURY SUFFICIENT TO CONFER STANDING UNDER ARTICLE III

The 12(b)(1) motion made by Defendants constitutes a facial attack on standing, and thus, the factual allegations of the complaint must be taken as true. *Thornhill Publ'g Co. v. General Tel. & Elec. Corp.*, 594 F.2d 730, 733 (9th Cir.1979); *see also, PNG Telecomm., Inc. v. Pac-West Telecomm, Inc.*, No. 10-1164, 2010 WL 3186195 at *2-3 (E.D. Cal. Aug. 11, 2010) (Damrell, J.). Defendants argue that Plaintiffs are constitutionally precluded from access to the Federal Courts under Article III by attacking the sufficiency of Plaintiffs' allegations with respect to "injury in fact" and/or "traceability." (*See* Apple Br. at 8-12; Tracking Defs. Br. at 8-11.)  Defendants do not dispute any material jurisdictional facts in the Complaint and have not proffered any evidence outside of the pleading with respect to such facts.  At this point in the proceedings, there is no factual rubric within which to consider the arguments of Defendants except for the facts alleged in the Complaint.[6]

---

[5] Harm allegations are further summarized infra at Section I., A.

[6] Apple miscites *Augustine v. U.S.*, 704 F.2d 1074, 1077 (9th Cir. 1983) by stating categorically that on a motion challenging standing, "no presumptive truthfulness attaches to plaintiff's allegations." (Apple Mem. at 6). However, that standard only applies to *factual* challenges to jurisdiction, not the facial challenge Defendants advance here. *See PNG Telecomm.*, 2010 WL

Article III standing derives from the separation of powers doctrine and is intended to prevent the judiciary from encroaching on the other branches by deciding political issues of general applicability.  To this end, Article III standing limits the court's subject matter jurisdiction to cases or controversies that are "*justiciable*," that is, arising from a constitutional, statutory or common law violation of an individual right and, as such, capable of being appropriately decided by resolution of the particular case or controversy before the court, as opposed to issues that are political, the resolution of which are generally applicable, and properly decided by the other branches.[7]

Hence, the "standing question. . . is whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief."  *In re Facebook Privacy Litig.*, No. 10-02389, 2011 WL 2039995, at *4 (N.D. Cal. May 12, 2011) (Ware, J.) (internal quotations and citations omitted) (holding that plaintiffs had standing, but dismissing claims on other grounds); *see also Jenkins v. McKeithen*, 395 U.S. 411, 423 (1969) ("In this sense, the concept of standing focuses on the party seeking relief, rather than on the precise nature of the relief sought.").  As Justice Alito has stated, "[i]njury-in-fact is not Mount Everest."  *Danvers Motor Co., Inc. v. Ford Motor Co.*, 432 F.3d 286, 294 (3d Cir. 2005).  To the contrary, it suffices for federal standing purposes to allege some specific, "identifiable trifle" of injury.  *Id.*; *See Council of Ins. Agents & Brokers v. Molasky-Arman,* 522 F.3d 925, 932 (9th Cir. 2008) (in affirming the plaintiff's standing, the Ninth Circuit court noted that the U.S. Supreme Court "has allowed important interests to be vindicated by plaintiffs with no more at stake in the outcome of an action than a fraction of a vote, a $5 fine and costs, and a $1.50 poll tax . . . .  'The basic idea that comes out in numerous cases is that an *identifiable trifle is enough to fight out a question of principle; the trifle is the basis for*

---

3186195 at *2-3.  Further, as explained by the *Augustine* Court, if the jurisdictional and substantive issues are so "intertwined that the question of jurisdiction is dependent on the resolution of factual issues going to the merits, the jurisdictional determination should await a determination of the relevant facts on either a motion going to the merits or at trial." *Id.*

[7] *See generally* 13A Charles Alan Wright, Arthur R. Miller, *et al*., *Federal Practice and Procedure* § 3531.4 (3d ed. 2011) ("The choice is made between the importance of having the issues decided by the courts and the importance of leaving the issues for resolution by other means").

1    ***standing*** and the principle provides the motivation.'") (emphasis added)). Here, the Plaintiffs'

2    allegations rise to far more than such a "trifle".

3            The determination of whether a plaintiff has standing is separate and preliminary to the

4    issue of whether the plaintiff adequately pleaded a cause of action. *Meaunrit v. ConAgra Foods*

5    *Inc.*, No. 09-2220, 2010 WL 2867393, at *4 (N.D. Cal. July 20, 2010) (Breyer, J.) ("While

6    [defendant] may indeed be correct that there is no cognizable cause of action in this case – *i.e.*,

7    there was no actionable misrepresentation – this is not the same thing as finding the plaintiff lacks

8    standing. Plaintiff alleges an injury, and alleges that it was caused by defendant's actions. ***Asking***

9    ***whether or not she has a legally cognizeable claim is not the same thing as asking whether she***

10   ***has suffered an injury in fact***.") (emphasis added). *See also Davis v. Passman,* 442 U.S. 228,

11   239 n.18 (1979) (court of appeals improperly confused the question of standing with the question

12   of whether plaintiff had a cause of action). Sufficiently alleging injury in fact creates a justiciable

13   issue that allows the court to advance to the merits inquiry.

14           Plaintiffs' allegations of injury arising from Apple and the Tracking Defendants'

15   misconduct raise a justiciable issue that the court has subject matter jurisdiction to decide. There

16   is no constitutional or factual basis for depriving Plaintiffs access to this Court, the only venue for

17   resolution available to them.

18           **A.    Apple Ignores Allegations of the Complaint That Satisfy Article III Standing**

19           Apple purports to recognize that Rule 12(b)(1) governs the standing inquiry (Apple Br. at

20   8-9), but then confuses the issue by invoking the Rule 12(b)(6) standard instead and by citing to

21   cases decided under Rule 12(b)(6) that do not address the standing issue. (*See* Apple Br. at 10).

22   After this initial confusion of the appropriate standard, Apple makes its Article III argument that

23   Plaintiffs "never claim that they themselves were injured." (Apple Br. at 5).   Defendant's

24   argument here shares a common denominator with its other arguments—the sacrifice of accepting

25   Plaintiffs' actual allegations in favor of a construction that conveniently ignores all allegations

26   that run counter to the legal arguments it advances.[8] Apple's assertion that "plaintiffs failed to

27   ────────────────

[8] Defendants' failure to respect the allegations of the Complaint is particularly apparent when one
looks at the primary Supreme Court authority cited.  In *U.S. v. Hays*, 515 U.S. 737 (1995) (Apple
28   Br. at 5), the Court found that appellees who alleged unequal treatment because of political
gerrymandering lacked standing, not because plaintiffs failed to allege an injury but rather,

allege that they ascribed any value to their 'personal' information" (Apple Br. at 10), is belied by even a cursory reading of the Complaint.  Contrary to Defendants' broad-brush analysis, the specific factual assertions of the Complaint establish legal harm sufficient to confer standing, even when considered in the context of the erroneous, higher legal standard that Defendants seek to apply.

Plaintiffs do allege and explain that "they themselves were injured" and do so with great detail and frequency.  Such cognizable injury in-fact is alleged two-fold, both as an economic injury, as well as the harm arising from the misappropriation of their personal information in which they had an interest.[9]

- Compl. ¶¶ 180-185: iDevices do not perform in the manner that Plaintiffs and Class Members reasonably expected at the time they purchased the product and thus "***Plaintiffs*** and the Class have suffered injury-in-fact and have lost money and property — specifically, personal information; the private and secure use of the iDevices and apps; and the opportunity cost of having installed and used Apple's iDevices and software." (emphasis added).

- Compl. ¶¶ 84 & 91:  Plaintiffs specifically allege that Defendants have misappropriated their personal information, which Plaintiffs use as an "asset of economic value…has discernable value as an asset in the information marketplace, where consumers may market their own information."

- Compl. ¶ 88:  Plaintiffs allege that the scarcity of consumer information increases its value, and therefore, by taking and propagating their personal information, the Tracking Defendants caused a diminution in its value.

- Compl. ¶¶ 84-87:  Tracking Defendants raised the price consumers paid to use the app but, instead of telling consumers or the website, Tracking Defendants simply reach around (or through) the app and into consumers' pockets, extracting their undisclosed premium in the form of Plaintiff's information.

- Compl. ¶¶ 74-83:  Plaintiffs were harmed by Defendants' actions in that their personal, private information was procured from their computers without their knowledge or consent.

---

because appellees, who did not live in the gerrymandered district, failed to demonstrate that they were the ones injured.  The court held that "any inference that the plaintiff has personally been subjected to a racial classification would not be justified absent specific evidence tending to support that inference."  *Id.* at 745.  Since appellees "have pointed to *no* evidence tending to show that *they* have suffered that injury, and our review of the record has revealed none," they were "asserting only a generalized grievance against governmental conduct of which he or she does not approve."  *U.S. v. Hays*, 515 U.S. at 745. (emphasis in original).  This bears no similarity to the allegations set forth in the Complaint and detailed herein.

[9] In fact, economic harm is a classic form of harm for standing purposes.  *See Friends of Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.,* 528 U.S. 167, 183–185 (2000) (harm to economic interest is among the permissible bases for injury in fact).

- Compl. ¶ 89: Plaintiffs allege that they were harmed by loss of opportunity of entering into value-for-value exchanges for their personal private information in transparent transactions.

- Compl. ¶¶ 3, 167 & 170-177: Plaintiffs allege that the installation and operation of Defendants' program impaired the condition and value of Class Members' iDevices because they were less secure, less valuable, and failed to preserve Plaintiffs and Class Members' privacy as promised by Apple.

As further evidence of the permissibility of Plaintiffs' access to this Court in pursuit of a remedy, Plaintiffs clearly have standing to seek restitution and other injunctive relief to rectify Defendant's actions in equity.

Plaintiff's allegations are distinguishable from those in *Birdsong v. Apple, Inc*., 590 F.3d 955 (9th Cir. 2009) (Apple Br. at 9-10,TD Br. at 9), where the Ninth Circuit ruled the plaintiffs lacked standing because they alleged only a "conjectural or hypothetical" injury, and did not allege that they or anyone else suffered an injury from using the iPod as designed. *Id*. at 960. The *Birdsong* Court concluded that the plaintiffs had not suffered an economic injury because plaintiffs' theory there rested solely on "a hypothetical risk of hearing loss *to other consumers who may or may not choose to use their iPods in a risky manner." Id*. at 961 (emphasis added).[10]

Finally, Defendants' reliance on *La Court v. Specific Media, Inc.,* No. 10-1256, 2011 WL 2473399 (C.D. Cal. Apr. 28, 2011) (Wu, J.) is misplaced. (App. Br. at 10-11; TD. Br. at 10-11). Unlike Plaintiffs here, the *Specific Media* plaintiffs referred to a host of facts, including facts pertaining to the value of their personal information, "not contained in their [c]omplaint *at all*." *Id*. at *4 (emphasis added).  An amended complaint was filed shortly after the dismissal without prejudice and took into account the admonitions of the Court, which in no way foreclosed the possibility of such theories of harm giving rise to Article III standing.  It bears noting that the *Specific Media* Court stated that it *did* recognize the viability in the abstract of such concepts as "opportunity costs," "value-for-value exchanges," "consumer choice," and other concepts referred to in Plaintiffs' opposition brief, and therefore allowed the plaintiffs to amend their complaint.  *Id.*

---

[10] Apple's reliance on the non-binding case of *In Re DoubleClick Privacy Litigation,* 154 F.Supp. 2d 497 (S.D.N.Y. 2001) is also misplaced. (App. Br. at 10-11). The *DoubleClick* court did not analyze the issue of standing. In *DoubleClick*, the plaintiffs' claim under the CFAA was dismissed because the plaintiffs failed adequately to allege damages or economic loss under claims of injury materially different from those set forth in this case, and which the court found were avoidable.

at *6. ("[i]t is not obvious that [p]laintiffs cannot articulate some actual or imminent injury in fact"). In fact, the *Specific Media* Court had no issue giving preliminary and final approval to several related cases which all alleged precisely the same harm.  These cases and their resolution demonstrate that the types of harm alleged here are unambiguously justiciable, and show in a rather pointed manner that the standard sought to be applied here by Defendants bears no similarity to the Constitutional issue of standing.

### B. Plaintiffs' Injury is not Too Speculative and is Directly Traceable to Apple's Misconduct.

An injury is "fairly traceable" to defendants' conduct if it is not "too tenuously connected" with the alleged misconduct or not too "speculative."  *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 969 & 975 (9th Cir. 2003) (the causation element of standing "is only implicated where the concern is that an injury caused by a third party is too tenuously connected to the acts of the defendant.") (internal quotations omitted); *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 361 F.3d 1108, 1120 (9th Cir. 2004) ("The causal connection put forward for standing purposes cannot be too speculative, or rely on conjecture about the behavior of other parties"), *amended by* 402 F.3d 846 (9th Cir. 2005); *see also Nat'l Wildlife Fed'n v. FEMA*, 345 F.Supp.2d 1151, 1162-63 (W.D. Wash. 2004).

Plaintiffs' injury cannot in anyway be described as "too tenuously connected" to Apple's conduct or "too speculative."  The Complaint alleges that Apple designed, manufactured and controlled the iDevices in such a way that it caused the disclosure of Plaintiffs' personal information, which constitutes injury.  (Compl. ¶¶ 6, 58& 61.)  It also alleged as an injury that Apple's design of the iDevices increased the risk of third parties accessing Plaintiffs' personal information.[11]  *Ocean Advocates,* 361 F.3d at 1120, is directly on point.  In *Ocean Advocates*, the Ninth Circuit found that an environmental organization had standing to challenge the Army Corps of Engineers' issuance of a permit to construct an extension to an existing oil refinery dock. While acknowledging that "other factors may also cause additional tanker traffic and increase the

---

[11] *See* Compl. ¶ 6 (Apple "designs its mobile devices to be readily accessible to ad networks and Internet metrics companies to track consumers and access their personal information" and enables Apps to "gain access to consumers' mobile devices to collect personal information they use to track and profile consumers").  Apple has failed in its duty to "protect the personal information of its users and security of their mobile devices." *Id.* ¶ 7.

attendant risk of an oil spill," the Ninth Circuit found there was a sufficient causal connection between the issuance of the permit and plaintiffs' injuries, reasoning that the link between the new platform and increased traffic was not tenuous or abstract and that the casual connection "need not be so airtight at this stage of litigation as to demonstrate that the plaintiffs would succeed on the merits." *Id.*   In the instant case, Apple's iDevices are like the new oil tanker platform in *Ocean Advocates*.  Just as construction of the new platform created the risk of an increase in oil tanker traffic, so too did Apple increase the risk of third party access to Plaintiffs' information by designing the iDevices in a manner that made such access not only possible, but inevitable. Consequently, as in *Ocean Advocates*, Plaintiffs' injury is more than "fairly traceable" to Apple's alleged misconduct.

Similar issues arose in *Hepting v. AT&T Corp.,* 439 F.Supp.2d 974 (N.D.Cal. 2006), where plaintiffs alleged that defendant AT&T had collaborated with the National Security Agency (NSA) in a surveillance program that tracked the domestic and foreign communications and communication records of millions of Americans, in violation of certain state and federal laws. 439 F.Supp.2d at 978.  Like Plaintiffs here, the *Hepting* plaintiffs alleged that they had suffered injury traceable to AT&T's misconduct of collecting personal information from its customers and allowing third parties access to this personal data *See Id*. at 1000. Like the Court in *Hepting*, this court should also find, at the very least, that Plaintiffs' allegations of personal injury arising from Apple's misconduct raise a justiciable issue the court has subject matter jurisdiction to decide.

## II.    THE APP DEVELOPERS ARE NOT NECESSARY PARTIES

Apple's Rule 19 argument is just one more example of Apple reneging on its promise to "take responsibility for the complete user experience." Apple has repeatedly announced to the world that "Our job is to take responsibility for the complete user experience.  And if it's not up to par, it's our fault, plain and simple."  (Compl. ¶¶ 1,3).  But now that iDevice users in this lawsuit are demanding that Apple make good on its word and "take responsibility for the complete user experience," Apple says it's no longer so "plain and simple."  Apple now claims that it cannot "take responsibility for" its misconduct unless the app developers ("Apps") are joined as third party defendants.  Apparently, Apple considers its assurances nothing more than empty rhetoric –

1    even though consumers relied upon them in entrusting their most personal data to Apple iDevices.

2        Moreover, while implicitly blaming the Apps for its own alleged misconduct, Apple

3    claims that joinder of the Apps as defendants is necessary to protect *the Apps'* interests -- even

4    though any of the Apps could have, but have not, sought to intervene.[12]  And even if the Apps had

5    a legally protected interest (which they do not), it could only arise from contracts between them

6    and Apple, the terms of which are not before the Court and, we can surmise, do not support

7    Apple's argument.  Apple has the burden of persuasion on this motion, and it cannot carry that

8    burden by relying on a confidential contract not even put into the record.

9        Fortunately, the Court need not allow Apple's parade of hypocrisies to carry the day

10   because Apple has not satisfied its Rule 19 burden of persuading the Court that the Apps are

11   parties that are "required" to be joined (if feasible), much less that they are indispensable to this

12   action such that it must be dismissed in their absence.  Accordingly, the Court should deny

13   Apple's Rule 12(b)(7) motion to dismiss for failure to join the Apps.

14   **A.      The Apps Are Not Required Parties Because They Have No Interest In The
         Litigation And The Court Can Accord Complete Relief Among The Existing
15       Parties**

16       Rule 19(a)(1) provides that a "Required Party" must be joined, if feasible, if "the court

17   cannot accord complete relief among existing parties" or the absent party "claims an interest

18   relating to the subject of the action."  Fed. R. Civ. P. 19(a)(1).  The Apps have not claimed any

19   legally protected interest in the pending litigation, nor do they have one, and the Court can grant

20   the complete relief sought by Plaintiffs without joining the Apps.  Consequently, the Apps are not

21   required parties.  *See generally Oculus Innovative Scis., Inc. v. Nofil Corp.*, No. 06-01686, 2007

22   WL 205068, at *2 (N.D. Cal. Jan. 25, 2007) (Illston, J.) ("It is a misapplication of Rule 19(a) to

23   add parties who are neither necessary or indispensable, who are not essential for just adjudication

24   and who have a separate cause of action entirely.").

25   **1.      The Apps Have Not Claimed Nor Can They Claim a Legally Protected
         Interest Relating to the Subject of the Action**

26       A crucial premise of mandatory joinder is that the absent party possesses an interest in the

27

28   [12] It should also be noted that each of the Apps named in the initially filed complaints agreed to
     tolling agreements and the production of documents in order to *not* be included in the
     Consolidated Complaint.

litigation that is legally protected, that the legally protected interest be "more than a financial stake," and that, when a purportedly legally protected interest arises from terms in bargained contracts, the interest be "substantial." *Cachil Dehe Band of Wintun Indians v. Cal.*, 536 F.3d 1034, 1041, *amended by* 547 F.3d 962 (9th Cir. 2008). Apple identifies no such legally protected interest. Instead it notes that the Apps could have been (and that some were briefly) named as defendants (Apple Br. at 22:10-12). But, this does not evidence a Rule 19 protected interest or an admission by Plaintiffs that the Apps are required parties any more than Apple's conclusory characterization of the Apps as "veritable glue," (*Id.* at 22:9) substitutes for the required Rule 19 analysis.[13]

The Apps have not "claimed" any interest in this action and this, under well-established Ninth Circuit precedent, is dispositive. *United States v. Bowen*, 172 F.3d 682, 688-89 (9th Cir. 1999) ("The district court next held that defendant could not assert that [the absent party] has a legally protected interested in the action, because [the absent party] itself has never *claimed* that it has such an interest. Defendant contends that a claim of interest is not required. Our precedent declares otherwise.") (emphasis in original); *see also Synopsys, Inc. v. Magma Design Automation, Inc.*, No. 04-3923, 2006 WL 825277, at *3 (N.D. Cal. Mar. 30, 2006) (Chesney, J.) ("The Ninth Circuit has held that Rule 19(a)(2) joinder is contingent upon the absent party's actually claiming a legally protected interest relating to the subject matter of the action.").

Indeed, the Apps *cannot* assert a legally protected interest in the subject of this litigation because any such interest could only be in trying to protect unlawful conduct (*i.e.*, the transmission of iDevice users' personal information to ad networks in violation of their contracts

---

[13] Notably, Apple does not argue that this litigation would result in issue preclusion, collateral estoppel or *res judicata* as to the Apps, nor can it. Moreover, the fact that the Apps may be guilty of and/or participated in alleged culpable conduct does not make them a required party. *See, e.g., Oculus*, 2007 WL 205068 (in action for misappropriation of trade secrets, absentee who actually disclosed the trade secrets and was an "active participant" in the tort was held not to be a required party, much less a party whose non-joinder required dismissal); *In re Wells Fargo Mortg. Lending Discrimination Litig.*, No. 08-1930, 2009 WL 2473684, at *3 (N.D. Cal. Aug. 11, 2009) (Chesney, J.) (in denying defendants' motion to join absent parties pursuant to Rule 19(a), the court noted, "[t]o the extent [defendant] is correct that conduct by the [absent party] is relevant to any claim or defense of an existing party, [defendant] fails to explain why it is necessary that the [absent party] be joined as defendants, as opposed to their officers and/or employees being called as witnesses.") In *Wells Fargo*, the court also noted that "as the Supreme court has held, a party is not necessary, for purposes of Rule 19(a), merely because the party could have been found, had it been named, jointly liable."). *Id.* at *3, n.6 (internal citations omitted).

with Apple and with iDevice users, and in violation of common law and statutory law).  (Compl. ¶¶ 3, 48.)  In essence, Apple premises its Rule 19 argument on a theory that the Apps have a legally protected interest in invading iDevice users' privacy.  Such an argument cannot prevail.

The Apps are also not required parties because, if they had an interest (which they do not), it could only arise from a contract between Apple and the Apps – and not the relationship between Apple and iDevice users that is at issue in this litigation.  Though Apple ignores it, this distinction between absentees who are required because they are parties to the contract at issue, and have a *substantial* interest in the litigation, and absentees who, like the Apps, are not required, because they are *not* parties to the contract at issue, and only have an *incidental* interest in the litigation, was recognized by the Ninth Circuit in *Cachil Dehe*, 536 F.3d at 1043 (holding that absentees were not required parties where the plaintiff did not seek to invalidate agreements to which absentees were parties but rather, where "[plaintiff] seeks to enforce a provision of its own Compact which may affect other tribes only incidentally.").  Similarly here, Plaintiffs do not seek to invalidate the contracts between Apple and the Apps but rather seek to enforce a provision of their own contracts with Apple, which may affect the Apps incidentally, if at all.  Consequently, Apple's reliance on *Clinton v. Babbitt*, 180 F.3d 1081 (9th Cir. 1999), and *American Greyhound Racing, Inc. v. Hull*, 305 F.3d 1015 (9th Cir. 2002) (Apple Br. at 23-24) -- in which the absentees were parties to, or substantially affected by, the contracts at issue -- is misplaced.[14]  Moreover, unlike the contracts at issue in *Clinton* and *American Greyhound*, the contracts here are not before

---

[14]  *Clinton* involved challenges to a Congressionally-ratified Settlement Agreement and accommodation agreement between the Navajo Tribe, the Hopi Tribe, and certain U.S. government officials concerning lands owned by the Hopi Tribe (the "1996 Settlement Act").  In *Clinton*, unlike the situation here, where the Apps are not parties to the agreement between Apple and Plaintiffs, the plaintiffs, defendants and the absentees were parties to the same agreement and that agreement was the subject of the litigation.

In *American Greyhound*, the court found that the absent tribe would be adversely affected if the relief sought by plaintiffs were granted, in that an "integral" term of their "bargained for" gaming compacts that provided automatic extensions or *renewals* would be converted to automatic *terminations*.  305 F.3d at 1023 ("Here, the interest of the tribes arises from terms in bargained contracts, and the interest is substantial.").  Moreover, an order granting plaintiffs' requested relief would amount to "a declaratory judgment that the present gaming conducted by the tribes is unlawful," which, the court suggested, could subject the tribes to **criminal** liability, such that "enforcement authorities may consider themselves compelled to act against the tribes."  *Id.* at 1024.  The court also noted that "[a]t a minimum, the tribes will be prejudiced by the required **termination** of their compacts that, in the absence of action by the Governor, would automatically renew.").  *Id.* at 1025 (emphasis added).

the Court and are considered confidential by Apple, Apple has not disclosed their terms, and, therefore, the Court cannot evaluate whether the Apps have the interest in this litigation asserted by Apple.

Finally, even if court enforcement of the contract between Apple and Plaintiffs means that Apple must breach its contract with the Apps, the Apps' legally protected interest in their right to sue Apple for the breach is in no way compromised.  *See, e.g.*, *Disabled Rights Action Comm. v. Las Vegas Events, Inc.*, 375 F.3d 861, 881 (9th Cir. 2004) (noting that where "the judgment *itself* would not mandate any change in the agreement, or any breach," other legal remedies may be pursued by the absentee) (emphasis in original).

## 2.     Complete Relief Can Be Granted Between the Existing Parties and in the Absence of the Apps

Plaintiffs seek an injunction that would prevent ***Apple*** from "identifying Plaintiffs and Class Members online, whether by personal or pseudonymous identifiers, and from monitoring, accessing, collecting, transmitting, and merging with data from other sources any information from or about Plaintiff and Class Members."  (Compl. Demand for Relief ¶ F.)  Thus, the relief sought relates only to Apple and is available with or without the Apps' participation.  *Disabled Rights*, 375 F.3d at 880 ("These forms of relief . . . would be available with or without [the absentee's] participation.").

No contractual terms between Apple and the Apps can prevent the Court from issuing injunctive relief as to Apple.  Contrary to Apple's assertion, Plaintiffs in this case do not seek to prevent Apple from providing the Apps with the information required for the Apps to perform their intended and legitimate functions for iDevice users.  (*Compare* Compl. ¶¶ 48, 53, and 69, *with* Apple Br. at 23:7-10.)  Rather, the relief sought would require Apple to stop disclosing iDevice users' personally identifiable information to third parties without their consent.  Any contract term requiring such disclosure would be contrary to law and to Apple's privacy policy, and, therefore, unenforceable.  Thus, if the relief sought is granted, the contract between Apple and the Apps would not be affected in any way that should matter except to Apple and the iDevice users.  Even if Apple's conduct with the Apps required or encouraged illegal conduct (*i.e.*, wrongful disclosure of personal information), Plaintiffs and Class Members should not have to

- 15 -

forgo injunctive relief on the ground that it would force Apple to breach an illegal and unenforceable term of its contracts with the Apps.  Apple owns and controls the App store and it is through that interface that plaintiffs can obtain all the injunctive relief sought here.

**B.    The Court Can Proceed In Equity And Good Conscience Without Joinder Of The Apps**

If the Court finds that the Apps are not parties who must be joined if feasible under Rule19(a), it is unnecessary for it to consider whether, under Rule 19(b), the action can proceed in equity and good conscience without their joinder.[15]  However, if the Court determines otherwise, and also finds that joinder of the Apps is not feasible, as Apple argues, then Rule 19(b) requires that the following factors be considered in determining whether, "in equity and good conscience," the action should proceed or be dismissed:

1.    The extent to which a judgment rendered in the person's absence might prejudice that person or existing parties;

2.    the extent to which any prejudice could be lessened or avoided;

3.    whether a judgment rendered in the persons absence would  be adequate; and

4.    whether there is an adequate remedy if the action were dismissed for nonjoinder.[16]

Fed. R. Civ. P. 19(b).

Apple relies on the first and fourth factors, neither of which warrants dismissal here.  As to the first factor, the Apps have not asserted, nor do they have, a legally cognizable interest in the action that would be impaired by a judgment rendered without their participation. As to the fourth factor, Plaintiffs do not have an adequate remedy if this action is dismissed for nonjoinder.  The conduct at issue is Apple's misconduct in designing mobile devices in a way that lays bare Plaintiffs' personal information to the world.  Apple is at the center of the misconduct—it's the hub of the wheel—that is at issue in this litigation.  And, as Apple admits, it is not feasible to join

---

[15] *Cachil Dehe*, 536 F.3d at 1041 ("Our conclusion that the absent tribes are not required parties under Rule 19(a) makes inapplicable the provisions of Rule 19(b) governing the decision whether to proceed with litigation when a required party cannot be joined; we therefore do not address the district court's determination of that issue.").

[16] Apple has the burden of persuasion on this issue.  *Makah Indian Tribe v. Verity*, 910 F.2d 555, 558 (9th Cir. 1990) ("The moving party has the burden of persuasion in arguing for dismissal."); *First Fin. Ins. Co. v. Butler Chamberlain-Nielsen Ranch Ltd.,* No. 10-2004, 2010 WL 4502151, at *2, (N.D. Cal. Nov. 2, 2010) (Armstrong, J.) citing *Makah*.

1   every App (Apple Br. at 22:3-4), nor does it make sense to join the Apps when a verdict against

2   Apple would prevent the alleged misconduct because the Apps would no longer have access to

3   iDevice personal information. [17]  Thus Apple's reliance on the fourth factor is misplaced because

4   this factor favors Plaintiffs' position.

5       For the reasons set forth above, Apple has not satisfied its burden to establish that the

6   action should be dismissed in "equity and good conscience."  Instead, it is clear that "in equity

7   and good conscience" the action should be allowed to proceed.

8   **III.    APPLE'S TERMS OF SERVICE DO NOT BAR PLAINTIFFS' CLAIMS[18]**

9       Apple contends that Plaintiffs seek to impose upon it an unfair form of vicarious liability,

10  making it the "guarantor" of App Developers and the Tracking Defendants.  To the contrary,

11  Plaintiffs merely seek to hold Apple accountable for its *own* actions.  Apple exercises total control

12  over its iDevices, its App Store, and its users' experiences.  (Compl. ¶¶ 1-5.)  Plaintiffs have

13  identified specific, active steps taken by Apple, either alone or in direct connection with the

14  Tracking Defendants, which form the basis for Plaintiffs' claims.  (*Id.*, at ¶¶ 56, 57 & 58(a)-(i).)

15  These actions violated Apple's common law duty to exercise reasonable care and were the

16  proximate cause of harm to Plaintiffs.

17      Apple also proudly proclaims that it has successfully disclaimed any liability for its

18  actions.  It has not.  Apple's reliance on its "Terms and Conditions" fails for numerous reasons.

19  *First*, Apple's one-sided disclaimer of liability is an unconscionable allocation of risk between

20  parties of unequal bargaining power and is therefore unenforceable.  *Second*, Apple's purported

21  disclaimer of its own negligence and its own violations of law are contrary to the public policy of

22  the State of California and are unenforceable. *Third*, a private party cannot disclaim its own active

23

24  [17] "The reason a Rule 19 defendant cannot be joined could well be pertinent to the analysis of the Rule 19(b) factors."  *Disabled Rights*, 375 F.3d at 867.

25  [18] As a threshold matter, the agreements relied upon by Defendants are not properly considered on
26  a motion to dismiss.  Although a defendant may rely on documents "whose contents are alleged in
    a complaint and whose authenticity no party questions," *Parrino v. FHP, Inc*., 146 F.3d 699, 706
    (9th Cir.1998), here, Defendants merely state that the documents are currently available on
27  Apple's website and fail to present any evidence that they are the same as were presented to
    Plaintiffs at any time prior to the filing of this lawsuit.  As such, Plaintiffs question their
28  authenticity, making their consideration inappropriate.  *See  Ferrington v. McAfee, Inc.,* 10-CV-
    01455-LHK, 2010 WL 3910169 (N.D. Cal. Oct. 5, 2010).

1  negligence unless it explicitly does so, which Apple has not done.  *Finally*, public policy prohibits
2  Apple from disclaiming liability for statutory violations.

3     **A.   Apple's "Disclaimer" Is an Unconscionable and Unenforceable Allocation of**
4          **Risk Among Parties of Unequal Bargaining Power.**

      "Under California law, a contract is unenforceable if it is both procedurally and
5  substantively unconscionable."  *Ingle v. Circuit City Stores, Inc.*, 279 F.3d 889 (9th Cir 2003); Cal.
6  Civ. Code § 1670.5.  Both procedural and substantive unconscionability must be present, but not
7  to the same degree. *O'Hare v. Mun. Res. Consultants*, 107 Cal.App.4th 267 (2003).   A relatively
8  larger degree of one will compensate for a relatively smaller degree of the other. *Samura v. Kaiser*
9  *Found. Health Plan, Inc.,* 17 Cal.App.4th 1284 (1993).   The procedural element focuses on
10 "unequal bargaining positions and hidden terms common in the context of adhesion contracts."
11 *24 Hour Fitness, Inc. v. Sup. Ct.*, 66 Cal.App.4th 1199, 1213 (1998).   The substantive elements
12 focus on terms, which are one-sided, lack justification and reallocate risks of a bargain in an
13 objectively unreasonable or unexpected manner.  *Ilkhchooyi v. Best,* 37 Cal.App.4th 395, 409-410
14 (1995).

15     Once a contract is found to be adhesive, the court must then determine whether other
16 factors are present which operate to render the contract unenforceable.  *Bolter v. Sup. Ct.,* 87
17 Cal.App.4th 900 (2001).  A contract provision will be denied enforcement if, considered in its
18 context, it is unduly oppressive or unconscionable. *Kinney v. United HealthCare Services, Inc.*, 70
19 Cal.App.4th 1322 (1999).  An unconscionable reallocation of risks occurs in a contract when a
20 seller shifts the risk connected with matters in its own control to the buyer, in contravention of the
21 basic principle that the risk of loss is most appropriately borne by the party best able to prevent its
22 occurrence.  *A & M Produce Co. v. FMC Corp*., 135 Cal.App.3d 473, 492 (1982).

23     Apple's purported contract is clearly a contract of adhesion.  It is hard to imagine a greater
24 disparity of bargaining power than between Apple, having sold over 200 million iDevices and
25 Plaintiffs, having purchased one, or maybe two such devices.  (See Compl. ¶ 27.)  Apple's lengthy
26 terms and conditions are presented on a take it or leave it basis to Plaintiffs with no opportunity to
27 alter or amend the agreement.  It is clear that a high level of procedural unconscionability exists in
28

this case.

Apple's attempt to absolve itself of all liability for both its own actions and those of third parties is one-sided, seeks to shift risk in an inherently unfair and oppressive way, and is without justification, for Apple exercises complete control over how its devices are designed, what software they can operate, how they interact with Apps, and what information they share with others.  (Compl. ¶¶ 1- 5.)  The user has basically no control over the iDevice, and is unable to block or opt-out of the data collection activity by Apple and the Tracking Defendants.  This level of control positions Apple as the only party able to effectively protect the users' personal information.  Placing the risk of Apple's negligence on its customers is fundamentally unfair, without justification and, when combined with the procedural unconscionablility outlined above, renders this provision unenforceable.

Where Apple acts as the sole arbitrator of which Apps appear in its App Store (Compl. ¶ 38), exercises complete control over how those Apps interact with information on Plaintiffs iDevices (*Id*.), purports to monitor the App's functions to ensure compliance with its App Developer Agreement (*Id*. at ¶¶ 3, 49, 51, 53, 54, and 55), assures its customers that it monitors Apps' compliance with this agreement (*Id*. at ¶ 38), yet shares in thirty percent (30%) of the revenue of all App sales (*Id*. at ¶ 39), it would be woefully unfair to force Plaintiffs to bear the burden that this system will break down and allow an App unfettered access to Plaintiffs' personal information.  Such a shift in risk is unreasonable and completely without justification.

Given the disparate bargaining power, and Apple's total control of Plaintiffs and Class Members' iDevice user experience, Apple cannot insulate itself from any responsibility for any damages caused by Apps or, for that matter, its own negligence.  These provisions of the Terms and Conditions are substantively as well as procedurally unconscionable and, as a result, are unenforceable.

**B.      Apple Cannot Disclaim Its Liability for Its Own Negligence**

Apple's attempt to disclaim liability for its own negligence is also contrary to public policy and unenforceable.  "All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of

another, or violation of law, whether willful or negligent, are against the policy of the law." Cal. Civ. Code § 1668. In *Tunkl v. Regents of Univ. of Cal.,* 60 Cal.2d 92, 102 (1963), the California Supreme Court held that, while generally private parties may contract to allocate loss between them, the exculpatory provision may stand only if it does not involve 'the public interest." *See id.* at 96.

The *Tunkl* Court set forth six characteristics typical of contracts affecting the public interest:

> (1) It concerns a business of a type generally thought suitable for public regulation. (2) The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public. (3) The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least any member coming within certain established standards. (4) As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services. (5) In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional fees and obtain protection against negligence. (6) Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents.

*Id.* at 98-101; *Gardner v. Downtown Porsche Audi*, 180 Cal.App.3d 713, 716-17 (1986). The Court also "emphasized a contract could involve the public interest even if it did not meet each and every one of these six criteria." *See id.*

In applying these factors, Courts have held that businesses such as automobile garages (*Id.* at 719), child care services (*Gavin W. v. YMCA of Metro. Los Angeles,* 106 Cal.App.4th 662, 675 (2003), residential leasing (*Henrioulle v. Marin Ventures, Inc.,* 20 Cal.3d 512, 519 (1978)), and yacht berths in harbors all involve the public interest (*Pelletier v. Alameda Yacht Harbor*, 188 Cal.App.3d 1551, 1555 (1986) ("For persons with boats, the availability of berths in harbors is a matter of practical necessity.  Thus the second *Tunkl* factor is present here.")).

Defendant's iDevices clearly meet all of the *Tunkl* standards: 1) the telecommunications industry is heavily regulated, and protection of consumer privacy on mobile devices was recently the subject of a hearing before the Senate Judiciary Subcommittee for Privacy, Technology and

the Law;[19] 2) Apple's iDevices are of great importance to the public;[20]  3) there can be little doubt that Apple holds itself out as willing to perform this service for any member of the public who seeks it.; 4) Apple, the party invoking exculpation, clearly possesses a decisive advantage of bargaining strength against any member of the public who seeks its services; 5) Apple, in exercising its superior bargaining power, confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional fees and obtain protection against negligence; and 6) as a result of the transaction, the person or property of the purchaser (in this case, Plaintiffs' information) is placed under the control of the seller, subject to the risk of carelessness by the seller or his agent.  In analyzing each of the *Tunkl* factors, it is clear that Apple's iDevices fall within the public interest.  As a result, Apple's attempts to insulate itself from liability for its own negligence are invalid as a matter of law.

## C.     Apple Cannot Disclaim Liability for Active Negligence In Administering Its App Store.

For an agreement to be construed as precluding liability for "active" or "affirmative" negligence, there must be express and unequivocal language in the agreement which precludes such liability.  *See CAZA Drilling (California), Inc. v. TEG Oil & Gas U.S.A., Inc.*, 142 Cal.App.4th 453 (2006).   An agreement which seeks to limit liability generally without specifically mentioning negligence is construed to shield a party only for passive negligence, not

---

[19]  *See* Transcript of Hearing, United States Senate Judiciary Subcommittee for Privacy, Technology and the Law, May 10, 2011.  Fed.R.Evid. 201(b) (The Federal Rules of Evidence allow for judicial notice allowed for of a fact that is "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."); *Metro. Creditors' Trust v. Pricewaterhousecoopers, LLP*, 463 F.Supp.2d 1193, 1197 (E.D. Wash. 2006) ( (If facts contained in public records are considered appropriate subjects of judicial notice)..  *Metro. Creditors' Trust v. Pricewaterhousecoopers*, LLP, 463 F.Supp.2d 1193, 1197 (E.D. Wash. 2006).  Plaintiffs do not ask the Court to take judicial notice of a particular fact discussed at the reference hearing, only that the Subcommittee discussed the need for public regulation of this area.

[20]  California courts have specifically rejected the notion that the public importance factor requires that the business involve a basic necessity of life such as food, medical care, or housing, recognizing that even such business as yellow page directory listings qualified under this factor because of their importance to small businesses.  *See McCarn v. Pac. Bell Directory,* 3 Cal.App.4th 173, 180 (1992).  Given the extensive daily use made of iDevices for such activities as banking, purchasing products, gathering information and navigating in automobiles (Compl. ¶ 37), the use of iDevices is at least as necessary as a yellow page directory listing or a yacht slip at a harbor.

for active negligence. *Id*. Further, "contractual clauses seeking to limit liability will be strictly construed and any ambiguities resolved against the party seeking to limit its liability for negligence." *Nunes Turfgrass, Inc. v. Vaughan-Jacklin Seed Co.*, 200 Cal.App.3d 1518, 1538 (1988). The word negligence does not appear in any of Apple's supposed disclaimers of liability in regards to its App Store. Apple first points to a supposed disclaimer in the App Store Terms of Service. *See* Apple Motion at 12, line 26. The language cited, however, merely deals with the "content or accuracy" of "third-party materials or websites." Apple also directs the Court to language providing that "[t]he application Provider . . . is solely responsible." Again, this provision does not mention Apple's negligence at all. Apple's final disclaimer regarding its App Store deals with materials submitted by the user, not information surreptitiously taken from a users' phone without the user's knowledge or consent. Therefore, none of Apple's relied upon disclaimers absolves it from its own, active negligence.

Finally, Apple cannot disclaim liability for its own statutory violations. *Nunes Turfgrass, Inc.,* 200 Cal.App.3d at 1538; Cal. Civ. Code § 3513 ("a law established for a public reason cannot be contravened by a private agreement"); Cal. Civ. Code § 1751 ("Any waiver by a consumer of the provisions of [the CLRA] is contrary to public policy and shall be unenforceable and void.") Plaintiffs plead that Apple is jointly and severally responsible for violations of various violations of statutory law in Claims Two, Three, Four, and Six. (Compl. ¶¶ 133, 137, 157, 178, and 195.) Apple's purported disclaimer of its statutory duties is unenforceable as to those claims.

Apple cannot rely on its purported disclaimers to absolve itself from liability in this lawsuit, as the law simply does not allow Apple to act with impunity as to its customers. As between Apple and its customers, Apple is in the best position to avert the types of harm incurred by Plaintiffs. The law does not allow an entity in such a position to insulate itself from a duty to use reasonable care to prevent harm to those to whom harm is likely to occur. In short, Apple's Terms and Conditions do not prohibit Plaintiffs' claims.

## IV.   PLAINTIFFS HAVE STATED PLAUSIBLE CLAIMS AGAINST THE TRACKING DEFENDANTS UNDER FED. R. CIV. P. 8(A)

Dismissals under Rule 12(b)(6) should be granted only in "extraordinary" cases. *United*

- 22 -

States v. City of Redwood City, 640 F.2d 963, 966 (9th Cir. 1981). Dismissal for failure to state a claim under Rule 12(b)(6) is generally disfavored by courts. *See Gilligan v. Jamco Dev. Corp*., 108 F.3d 246, 249 (9th Cir. 1997). When considering a motion to dismiss, the allegations contained in the complaint must be construed in the light most favorable to the plaintiff. *See Parks School of Business, Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). Further, [d]ismissal is appropriate only when the plaintiff can prove no set of facts in support of his claims that would entitle him to relief." *Guerrero v. Gates*, 442 F.3d 697, 703 (9th Cir. 2006). The Court should consider "whether the total of plaintiffs' allegations...are sufficient." *Lipton v. Pathogenesis Corp*., 284 F.3d 1027, 1038 (9th Cir. 2002). A Complaint only needs enough facts "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, -- U.S. --, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (internal citations and quotations omitted). Additionally, "the pleading standard Rule 8 announces does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.*

When considering a Rule 12(b)(6) motion the question is not whether a plaintiff will ultimately be able to prevail on the merits of the case, but whether the plaintiff is entitled to offer evidence to support the claims. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 583, 127 S. Ct. 1955, 1981, 167 L. Ed. 2d 929 (2007); *see also, In re Toyota Motor Corp*. (No. 8:10-ml-02151-JVS-FMO), 2011 WL 1840555, at *7 (C.D. Cal. May 13, 2011) ("The primary focus of *Twombly* and *Iqbal*…is on the pleading as a whole: does the pleading allege enough facts to plausibly infer that the pleader is entitled to relief?").

Finally, if a dismissal is granted under Rule 12(b)(6), leave to amend should be ordered unless "the pleading could not possibly be cured by the allegation of other facts." *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995) (citations omitted).

When taken as a whole, the Complaint alleges enough facts for the Court to plausibly infer that Plaintiffs are entitled to relief. In addition, Plaintiffs have met their burden under Rule 8(a) of putting each Defendant on fair notice of their respective alleged wrongful conduct. *See Erickson v. Pardus*, 551 U.S. 89, 127 S. Ct. 2197, 2200 (2007) ("Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to

- 23 -

relief." Specific facts are not necessary; the statement need only "'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'") (citations omitted). The Complaint differentiates between conduct committed by Apple and conduct committed by the Tracking Defendants.  The Tracking Defendants are grouped together because Plaintiffs have alleged that they engaged in the *same* wrongful conduct. Contrary to Tracking Defendants' contentions (TD Br. at 15-15), such pleading satisfies Rule 8(a)'s minimal notice-pleading standard. *See Starr v. Sony BMG Music*, 592 F.3d 314, 325 (2nd Cir. 2010) (rejecting as "incorrect" the argument that "*Twombly* requires that a plaintiff identify the specific time, place, or person related to each conspiracy allegation"); *See also In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F.Supp.2d 1011, 1019 (N.D. Cal. 2010) (stating the courts "do not require plaintiffs in complex, multinational, antitrust cases to plead detailed, defendant-by-defendant allegations").

In re Providian Fin. Corp. ERISA Litig., 2002 WL 31785044, at *1 (N.D. Cal. Nov. 14, 2002), cited by Tracking Defendants (TR Br. at 16), illustrates Plaintiffs' point.  The *Providian* plaintiffs alleged breach of fiduciary claims under ERISA against multiple classes of defendants, including Providian, selected officers ; the individual members of the Board of Directors, as well as certain members of various committees of the Board. *Id.*  The court held that Rule 8(a)'s notice pleading standard was not satisfied because the plaintiffs "lumped the *various classes* of defendants into an undifferentiated mass and alleged that all of them violated *all* of the asserted fiduciary duties."). *Id.*  In contrast, here, each of the Tracking Defendants are mobile advertising companies that collect personal information transmitted from users' iDevices (Compl. ¶¶15-23) and therefore belongs in the same class of defendant.

## V.    PLAINTIFFS HAVE STATED CLAIMS AGAINST ALL DEFENDANTS UNDER THE COMPUTER FRAUD AND ABUSE ACT

### A.    CFAA Is Not Limited To Targeting Criminal Hackers

The CFAA is no longer a criminal statute designed to target hackers and technology criminals alone. The statute, which targets "fraud and related activities in connection with computers," was amended in 1994 "to expand the statute's scope to include civil claims challenging the unauthorized removal of information or programs" from a protected computer. *Pac. Aerospace & Electronics, Inc. v. Taylor*, 295 F.Supp.2d 1188, 1196 (E.D. Wash. 2003)

- 24 -

(citing *Shurgard Storage Ctrs., Inc. v. Safeguard Self Storage, Inc*., 119 F.Supp.2d 1121 (W.D. Wash. 2000)).  The current version of the statute explicitly provides for civil remedies for "any person who suffers damage or loss" by a violation of certain provisions of the CFAA and allows the aggrieved person to maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief.  18 U.S.C. 1030(g).  Indeed, the many revisions to the CFAA have broadened its scope to impose liability for those who illegally use computers for commercial advantage.

Tracking Defendants contend "the CFAA was never intended to criminalize standard industry practices." (TD Br. at 20.)  Here, however, Plaintiffs allege that Apple made numerous statements about Apple's procedures and industry standards designed to *protect* personal information.  (Compl. ¶ 36).  Indeed, Apple's repeated assurances that personal information is protected from the conduct complained of in the Complaint belies the Tracking Defendants' baseless assertion that their conduct (as well as Apple's) was a standard industry practice.  (TD Br. at 20.)  In fact, the fact that some industry participants may engage in repeated violations of the CFAA as a common practice does not excuse the violations from liability under the CFAA.

**B.      Plaintiffs Adequately Allege That Defendants Violated the CFAA**

The CFAA prohibits any person from intentionally accessing a computer without authorization or exceeding authorized access, and thereby obtaining information from any protected computer. 18 U.S.C. § 1030(a)(2)(C). Additionally, the CFAA prohibits any person from (i) knowingly causing the transmission of a program, information, code or command, and as a result of such conduct, intentionally causing damage without authorization, to a protected computer, or (ii) intentionally accessing a protected computer without authorization, and as a result of such conduct, recklessly causing damage.  18 U.S.C. §§ 1030(a)(5)(A) & (B).

Plaintiffs have adequately alleged that Defendants violated these CFAA provisions.  As to Apple, Plaintiffs allege that it knowingly caused the transmission of code (by native installation or iOS upgrade) to Plaintiffs and Class Members' iDevices and that such code caused their iDevices to synchronize and retain detailed, unencrypted location history files. (See Compl. ¶125).  As to the Tracking Defendants, Plaintiffs alleged that they knowingly caused the transmission of a

command to be downloaded to Plaintiffs' and Class Members' iDevices; that they intentionally accessed Plaintiffs and Class Members' iDevices without authorization, and as a result of such conduct, recklessly caused damages to Plaintiffs and Class Members' iDevices by impairing the integrity of data and/or system and/or information; and that they intentionally accessed Plaintiffs and Class Members' iDevices without authorization, and as a result conduct, caused damage and loss to them. (Compl. ¶¶ 127-129). These allegations are sufficient to establish a violation of the CFAA and the requisite intent. *See Craigslist, Inc. v. Naturemarket, Inc.*, 694 F.Supp.2d 1039, 1056-57 (N.D. Cal. 2010) (outlining the elements of a CFAA claim under § 1030(a)(5)(B) and (C)).

### 1. Plaintiffs Have Adequately Alleged "Damage *Or* Loss" Under The CFAA

Tracking Defendants contend that the Complaint fails to allege "that Plaintiffs incurred any costs in responding to the alleged unauthorized access" or "that Plaintiffs' devices, data, or information were impaired or degraded." (TD Brf. p. 18 ).  Contrary to Defendants' assertion, Plaintiffs have alleged both "damage" and "loss" under the CFAA.[21]

#### a. Allegations of Damage

"Damage" is defined as "any impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8). Plaintiffs allege that Tracking Defendants have damaged them by harming the integrity of their data and the information stored on their mobile devices, and by taking that data. (Compl. ¶ 74-98).  For example, Plaintiffs allege that by taking and retaining their personal information without their consent, Defendants have caused a diminution of value of such information. (Compl. ¶ 88).[22] This impairment to the

---

[21] Although pleading damage is required under CFAA claims, Plaintiffs need not plead both damage and loss specifically in order to bring a claim under CFAA's civil action provision.  That provision states that, to bring a civil claim under the CFAA a plaintiff need to demonstrate damage *or* loss.  18 U.S.C. § 1030(g).

[22] The information marketplace includes opportunities for consumers themselves to market their information directly to online websites and advertisers and control the transfer of their information. As the co-founder of Allow Ltd., an online company that offers to sell people's personal information on their behalf and give them 70% of the sale, has stated, the more scarce the individual's data in the information martketplace, the more valuable it becomes. *See Julia Angwin*, et al., Web's Hot New Commodity: Privacy, WSJ.com, February 28, 2011 available at http://online.wsj.com/articleSB10001424052748703529004576160764037920274.html.

integrity of data or information qualifies as damage under the CFAA. *See e.g., I.M.S. Inquiry Mgmt. Sys., Ltd. V. Berkshire Info. Sys., Inc*., 307 F. Supp. 2d 21, 525 (S.D.N.Y. 2005) (finding sufficient allegations of CFAA damages despite lack of allegations of physical damage to data). Plaintiffs further allege that through Apple's control over the iDevices and App development, Apple has allowed developers to create apps that harm the security and integrity of Plaintiffs' personal information.  (Compl., ¶ 58, 61, 73, 132). *See Expert Janitorial LLC v. Williams*, No. 03:09-CV-283, 2010 WL 908740, at *8 (E.D. Tenn. Mar. 12, 2010) (noting the legislative history of the CFAA supports conclusion that intentionally rendering a computer system less secure may be considered damage). Finally, Plaintiffs have alleged that the Defendants' tracking activities have impaired the condition and value of Plaintiffs and Class Members' iDevices. (Compl. ¶128, 130). Plaintiffs had alleged (albeit under the trespass claim) that the Tracking Defendants' actions have resulted in the diversion and consumption of Plaintiff and Class Members' mobile computing resources (such as space, memory, processing cycles, and Internet connectivity) in ways that they did not expect and in ways that diminished the utility and performance of their iDevices. (Compl., ¶ 130, 170-177). [23]

### b.   Allegations of Loss

In order to bring a civil action under the CFAA, Plaintiffs must allege "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value.   18 U.S.C. § 1030(c)(4)(A)(i)(I); *see also* 18 U.S.C. § 1030(g) (providing that in order to maintain a civil action under the CFAA a plaintiff must allege one of the factors set out in subclause (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i)).  "Loss" is defined as "*any* reasonable cost[24] to any victim,

---

[23] An iDevice has limited battery, memory capacity, processing power, and bandwidth. The Tracking Defendants' code embedded in Apps taxes these resources with the processing of data on the iDevice and the transfer of data to the servers of the Tracking Defendants.  The burden on Plaintiffs and Class Members' resources is even greater when Apple and the Tracking Defendants process GPS location data, which requires particularly resource-intensive operations and, further still, when Apple captures and transfers GPS coordinates opportunistically. Tracking Defendants utilized Plaintiffs and Class Members' bandwidth notwithstanding the fact that Plaintiffs and Class Members pay their Internet Service Provider and/or mobile provider fees for such data services.

[24] The CFAA does not define "costs." The ordinary meaning of costs is the "amount or equivalent paid or charged for something; the outlay or expenditure (as of effort or sacrifice) made to achieve an object." Merriam-Webster Dictionary, available at http://www.merriam-

including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service."  18 U.S.C. § 1030(e)(11).

Plaintiffs have alleged that they have expended money, time and resources in order to remove the unauthorized program installed on their iDevices (and to therefore identify the locations of the tracking files, the identity of the tracker, and the App affected) (*See* Compl. ¶¶ 131, 177). The costs expended by Plaintiffs to remediate the negative effects on their iDevices resulting from Defendant's conduct are compensable under the CFAA. *See Mortensen v. Bresnan Communication*, L.L.C., No. CV 10-13-BLG-RFC, 2010 WL 5140454, at *7 (D. Mont. Dec. 13, 2010) (plaintiffs adequately pled loss or damage under the CFAA where plaintiffs alleged that they were forced to expend time, money and resources to investigate and repair their personal computer's diminished performance in order to mitigate Defendant's invasive actions of allowing tracking technology to disable and alter Plaintiffs' security features on their computers in order to place its "cookies" to track their Internet activities); *SuccessFactors, Inc. v. Softscape, Inc.,* 544 F.Supp.2d 975, 980-81 (N.D. Cal. 2008) (J. Wilken) ("…where the offender has actually accessed protected information, discovering who has that information and what information he or she has is essential to remedying the harm. In such cases courts have considered the cost of discovering the identity of the offender or the method by which the offender accessed the protected information to be part of the loss for purposes of the CFAA).[25]

Finally, Plaintiffs have alleged that Defendants impose undisclosed economic costs on Plaintiffs and Class Members by taking more information than they are entitled to take (Compl. ¶87) and impose opportunity costs on them in that they are deprived of the opportunity to have entered into value-for-value exchanges with other App providers whose business practices better

---

webster.com/dictionary/cost. Therefore, "reasonable costs," do not require a transfer of *money*; reasonable costs can be incurred anytime there is a deprivation of something of value.
[25] Though not alleged in the Complaint, Plaintiffs have incurred costs as a result of an "interruption in service" as the Tracking Defendants (in their tracking activities) and Apple (in its geolocation tracking) consumed Plaintiffs and Class Members' bandwidth and effectively slowed down their Internet connection, for which they pay a monthly fees. If given leave to replead, Plaintiffs would include those allegations in an amended complaint.

conform to their expectations about privacy and security (*Id.* at ¶89), or to simply decline to enter into any exchanges whatsoever—with the Tracking Defendants or any app provider (*Id.* at ¶90). These undisclosed costs qualify as economic losses under the CFAA. *See In re Toys R Us, Inc., Privacy Litig.*, 00-CV-2746, 2001 WL 34517252 (N.D. Cal. Oct. 9, 2001) (plaintiffs had adequately alleged loss under the CFAA where the plaintiff alleged that loss entailed the misappropriation of the economic value of plaintiffs' and class members' personality because the personal information obtained by defendants could be sold to market researchers for plaintiffs' financial gain).

Tracking Defendants rely on *In re DoubleClick Privacy Litigation*, 154 F. Supp. 2d 497, 503 (S.D.N.Y 2001), to argue that the loss suffered by Plaintiffs has no economic value. *DoubleClick*, however, addressed the collection of information through the use of electronic "cookies." *Id.* at 503. The electronic cookies at issue in *DoubleClick* "*only* collected information concerning users' activities *on DoubleClick-affiliated Web sites*.... DoubleClick is never alleged to have accessed files, programs or other information on users' hard drives." *Id.* at 504 (emphasis in original). The *DoubleClick* Court also noted that, unlike Plaintiffs here, plaintiffs in that case had the opportunity to request an "opt-out" cookie or could block cookies from being deposited on their computers. *Id.* 504-505.

However, the Court in *DoubleClick* did not dismiss the case on the grounds that there was no economic loss, and specifically noted that there was the possibility of "some value" that could be placed on the loss. *Id.*; *see also Toys R Us, Inc., Privacy Litigation*, No. 00-CV-2746, 2001 WL 34517252, at *10 (N.D. Cal. Oct. 9, 2001) (court recognized the possibility of economic loss in the context of loss of personal information).

This case is distinguishable from *DoubleClick* for two primary reasons. First, *DoubleClick* addressed the use of cookies that tracked information on DoubleClick affiliated Web pages. There was no allegation that DoubleClick accessed files, programs, or other information from users' hard drives. In contrast, here, Plaintiffs allege that the Tracking Defendants accessed information stored on their mobile devices. (Compl. ¶ 58). Thus, the scope of information, the type of personal information and data acquired by the Tracking Defendants, and the means of access to the information here is much broader than in *DoubleClick*. Here, Plaintiffs here allege

1  that the Tracking Defendants took information from Plaintiffs' mobile devices themselves, unlike

2  the information captured in *DoubleClick*, which was information Plaintiffs submitted on Tracking

3  Defendant-related web pages.  *Id.*

4          Second, the Northern District of California has specifically allowed the aggregation of

5  claims regarding multiple computers if the damages arose from the same act by the defendant.  *In*

6  *re Apple & ATTM Antitrust Litig.*, 596 F. Supp.2d 1288 (N.D. Cal. 2008) (citing *In re Toys R Us,*

7  *Inc. Privacy Litig.*, 2001 WL 34517252, *11 (N.D. Cal. 2001)).   The same act has been

8  interpreted to encompass a defendant's act of "releasing for distribution . . .  millions of copies of

9  an Internet access product, which, once installed, allegedly caused the damage to computers."

10 *Toys R Us*, 2001 WL 34517252, at *11 (citing *In re America Online, Inc.*, 168 F. Supp.2d 1359

11 (S.D. Fla. 2001)). Here, Plaintiffs allege that, as a result of Apple and the Tracking Defendants'

12 conduct, the damages are of the same type and form and are a result of the same conduct.

13 (Compl., ¶¶ 125-134; 137). This conduct by all Defendants constituted the operation of an

14 integrated system in which a key part of the design purpose—from iDevice hardware, to its iOS,

15 designed to interact with apps built to Apple's specifications, and distributed though the Apple-

16 controlled App store—made user identifiers, files, and activity available for collection and use to

17 Defendants for their own purposes.  Unlike *DoubleClick*, in this case Plaintiffs may aggregate

18 their damages.  Even if this Court were to find the economic value associated with the private

19 information extracted from Plaintiffs' mobile devices to have only a modest economic value, the

20 sheer number of the claims will result in well over $5,000 in damages and economic loss.

21         Plaintiffs allege that the Tracking Defendants' conduct has caused a loss to one or more

22 persons during any one-year period aggregating at least $5,000 in value in real economic

23 damages.  *See* Compl., ¶ 134. Plaintiffs allege that the Tracking Defendants took (1) information

24 from Plaintiffs' address books, including contact information and a notes field where sensitive

25 information may be stored; (2) Plaintiffs' cell-phone numbers; (3) information regarding

26 Plaintiffs' file systems; (4) Plaintiffs' geolocation, which provided the Tracking Defendants with

27 information regarding Plaintiffs' physical location and movements; (5) a record of Plaintiffs'

28 keystrokes in the devices keyboard cache; (6) Plaintiffs' photographs; and (5) other information

such as the International Mobile Subscriber Identity, SIM card serial number, and universally unique device identifier. *Id*. at ¶ 58. This information has great value to the Tracking Defendants, and Tracking Defendants sell this personal information. *Id*. at ¶ 81. This conduct reduces the value of Plaintiffs' personal information, and denies Plaintiffs the right to utilize the economic value of their own personal information. *Id*. at ¶¶ 88, 90-91. In addition to sufficiently alleging a loss of the economic value of their personal information, Plaintiffs have additionally alleged that they have suffered loss of their right to privacy. *Id*. at ¶ 135.

### 2.      The Tracking Defendants accessed Plaintiffs' iDevices "without authorization" or "exceeded authorized access" to those devices

The CFAA defines "exceeds authorized access" as "to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter." 18 U.S.C. § 1030(e)(6). Even when narrowly interpreted, "an 'exceeds authorized access' violation occurs when initial access to a protected computer is permitted but the access of certain information is not permitted." *Shamrock Foods*, 535 F. Supp. 2d at 962. The Northern District of California recently held that an iPhone owner could not maintain a CFAA violation where the software that allegedly harmed the phone was voluntarily downloaded by the iPhone owner. *In re Apple & ATTM Antitrust Litig.*, No. C 07-05152, 2010 WL 3521965, at *7 (N.D. Cal. July 8, 2010). In that case, however, the software itself caused the damage. *Id*. Here, Plaintiffs may have knowingly downloaded Apple software, but they did not knowingly download or authorize the code allowing the tracking and extraction of their personal information completely unrelated to the functioning of the Apps.

The Tracking Defendants nonetheless argue that Plaintiffs cannot allege that Tracking Defendants' access exceeded Plaintiffs' authorization because Apple's disclosures to Plaintiffs stated that "information [might be] collected by third parties, which may include such things as location data or contact details." TD Brf. p. 19. Defendant Apple similarly argues that the installation or upgrade of the iOS on user devices does not violate the CFAA because Plaintiffs authorized the installation or upgrade. Apple Brf. p. 18.

But as Plaintiffs have alleged, nothing in the Apple disclosures, including the language Apple cites, would put a reasonable consumer on notice of the mechanism and manner by which

- 31 -

the iDevice and apps allow a user to be tracked and have their personal information shared with third parties.  (Compl., ¶ 59).  Plaintiffs allege that they did not authorize Apple to download or install a code that would allow Tracking Defendants to acquire such a wide range of personal and sensitive information.  *Id.* at ¶ 76.  To the contrary, Apple tells consumers that "Apple takes precautions – including administrative, technical, and physical measures – to safeguard your personal information against loss, theft, and misuse, as well as against unauthorized access, disclosure, alteration, and destruction." *Id.* at ¶ 36.

Plaintiffs further allege that Apple tells consumers that an App may not access information from or about the user stored on the user's iDevice unless the information is necessary for the app to function and does not allow an app to transmit data from a user's iDevice to other parties without the user's consent.  *Id.* at ¶ 53, 55.  The information obtained from Plaintiffs by the Tracking Defendants goes well beyond any information related to the functioning of the App. Based on these representations, Plaintiffs have sufficiently alleged that nothing in Apple's disclosures would have put a reasonable consumer on notice of the breadth and scope of the information obtained from their devices.

Finally, Apple argues that Plaintiffs did not sufficiently allege that Defendant Apple intended its iOS design to permit unauthorized access to the device information.  Apple Brf. p. 18. But Plaintiffs allege that Apple's design of the iDevice permits application developers to create Apps that can easily access a wide variety of personally identifiable information, including the iDevice user's physical location.  *Id.* at ¶ 58.  Plaintiffs further allege that Apple was and is aware that Tracking Defendants use Apps to acquire consumers' personal information and that Apple has taken no meaningful steps to stop this practice and has continued to allow App developers that engage in this practice to run their apps on Apple's iOS platform.  *Id.* at ¶ 66, 71, 73.  Although Apple amended its Developer Agreement in 2010 to formally prohibit Apps from transmitting data to third-parties except for information that is directly necessary for the app to function, Apple has taken no steps whatsoever to actually implement or enforce this formal change to Apple's Developer Agreement.  *Id.* at ¶ 48, 66.

Citing *Shamrock Foods Co. v. Gast*, 535 F. Supp. 2d 926, 966 (D. Ariz. 2008), Tracking

Defendants also argue that the CFAA's legislative history indicates that the intent of the law was to prohibit electronic trespassing, but not the subsequent use or misuse of the information.  TD Brf. p. 20.  However, even the *Shamrock Foods* Court stated that under the plain language of the CFAA a defendant violates the statute when the "initial access is permitted but access of certain information is not permitted."  *Shamrock Foods*, 535 F. Supp. 2d at 967 (quotation omitted).  The *Shamrock Foods* Court further found that the CFAA applies more broadly than just electronic trespass, and it did not foreclose a claim for damages under the CFAA for the improper use of information obtained by exceeding authorized access to a computer.

## VI.   PLAINTIFFS HAVE STATED CLAIMS AGAINST ALL DEFENDANTS UNDER THE CALIFORNIA'S COMPUTER CRIME LAW ("CCL")

### A.   Plaintiffs Have Adequately Alleged "Damage Or Loss" Under The CCL.

In the previous section, Plaintiffs outline a number of ways in which they suffered sufficient "damage or loss" under the CFAA.  For the same reasons outlined in the previous section, Plaintiffs identify sufficient "damage or loss" to state a claim under the CCL.

### B.   Plaintiffs Have Adequately Alleged That The Tracking Defendants Accessed Their iDevices "Without Permission"

Plaintiffs specifically allege that Defendants' access to their iDevice and the personal data contained therein was "without permission."  See Complaint ¶¶ 138-148.  To counteract this assertion Defendants rely on *In re Facebook Privacy Litig.*, No. C 10-02389, 2011 WL 2039995 (N.D. Cal. May 12, 2011) which in turn relies on *Facebook, Inc. v. Power Ventures, Inc.*, No. C 08-05780, 2010 WL 3291750, at *11 (N.D. Cal. July 20, 2010)).

In each of those cases, however, the defendant claimed to have gained access to the plaintiffs' computer with authorization, yet the plaintiff claimed that the defendant subsequently took actions which violated the terms of that authorization.   In order to prevent what the Court concluded would be a "constitutionally infirm" result, the Court in *Power Ventures* held that, in that case, the plaintiffs were required to plead that the defendant "overcame technical or code-based barriers." in order to show that the defendants' actions were taken "without authorization." *See Power Ventures, Inc.*, 2010 WL 3291750 at *11.  Such a result was necessary to "eliminate[] any constitutional notice concerns, since a person applying the technical skill necessary to

overcome such a barrier will almost always understand that any access gained through such action is unauthorized." *Id.* at 12.  The Court in *In re Facebook*, similarly applied this analysis when dealing with a claim that otherwise authorized access became "without permission" "as a consequence of Defendant's 're-design' of its own website." *See In re Facebook*, 2011 WL 2039995 at *8.

Here, Plaintiffs sufficiently allege that the Tracking Defendants gained access to the information on Plaintiffs' iDevices without ever having Plaintiffs' permission at all (as opposed to initially having access and then violating the terms of that access).  To support this allegation, Plaintiffs allege that the Tracking Defendants gained access to consumers' data by paying App developers to include surreptitious tracking codes in the program code for Apps and, when a consumer uses an App, a Tracking Defendant's code enables them to collect personal and identifying information from the consumers' iDevice.  (Compl., ¶ 63-64).  Only through the use of specific code could Tracking Defendants gain such access to and information from Plaintiffs' iDevices.  *Id.* at ¶ 63-64, 67, 144.  Under these circumstances it is clear that the Tracking Defendants were not merely exceeding the scope of authorization, as was the case in *Power Ventures* and *In re Facebook*.  In this instance, Tracking Defendants never had Plaintiffs' permission to access their iDevices in the first place.  In fact, Plaintiffs were not even aware the intrusion was taking place.

Further, Apple's liability stems not just from its placement of its iOS operating system on Plaintiffs and Class Members' iDevice, but rather from Apple's entire end-to-end control of the iDevice experience.  In exercising such complete control, Apple has effectively prohibited its users from protecting their personal information.  Apple is fully aware of the practices of the Tracking Defendants and derives a benefit from its portion of the increased sales of Apps that Tracking Defendants actions cause.  Apple has actually implemented polices to stop the transmission of data by Apps to the Tracking Defendants.  *Id.* at ¶ 48, 66.  But Apple has failed to enforce these policies despite its knowledge that Apps are providing a conduit for the Tracking Defendants to acquire personal information without Plaintiffs' knowledge or consent.  *Id.* at ¶ 71, 73.  Because of Apple's complete control over coding, the development process and policies

related to Apps, Plaintiffs and Class Members are wholly unable to detect, manage, or avoid the installation of the tracking code. *Id.* at ¶ 43-48, 70. When coupled with Apple's stated policy prohibiting such practices, Apple's awareness that Tracking Defendants were engaging in these activities, Plaintiffs' lack of knowledge of the Tracking Defendants activities, and Apple's monetary benefit from the Tracking Defendants' activities, Apple's argument that it had Plaintiffs permission to engage in such access to their iDevices rings hollow.

### C.  Plaintiffs Sufficiently Allege a Claim for Violation of Section 502(c)(8)

Notably, Plaintiffs' claim under California Penal Code section 502(c)(8) does not require that the access be "without permission"; it only requires that a defendant "[k]nowingly introduces any computer contaminant into any computer, computer system, or computer network." "Computer contaminant" is specifically defined as "any set of computer instructions that are designed to modify, damage, destroy, *record, or transmit information* within a computer, computer system, or computer network without the intent or permission of the owner of the information." Cal. Penal Code § 502(b)(1) (emphasis added). Because this code section does not require a lack of permission, Plaintiffs are not required to allege that, in accessing an iDevice, Defendants had to overcome a code-based or technical barrier. *See In re Facebook*, 2011 WL 2039995 at *8 n.11 (stating section 502(c)(8) does not require that a defendant act "without permission").

Plaintiffs specifically allege that Defendants knowingly introduced a set of computer instructions into Plaintiffs' iDevices with the intent to record, acquire, and transmit information from the iDevice that has nothing whatsoever to do with the normal functioning of the iDevice or the Apps. *See* Compl. ¶  63-64; 68-70. Further, Plaintiffs allege that Apple caused the transmission of code that "caused users' iDevices to maintain, synchronize, and retain detailed unencrypted location history files." *See* Compl. ¶ 140. These allegations are sufficient to state a claim under this subsection of the CCL against all Defendants.

## VII.  PLAINTIFFS HAVE PROPERLY STATED A CLAIM UNDER THE UCL

### A.  Legal Standard

Defendants incorrectly argue that Plaintiffs' claims for violations of the UCL sound in

fraud and thus, are subject to Rule 9(b). California courts have repeatedly held that claims under the UCL are distinct from common law fraud and not subject to Rule 9(b)'s heightened pleading standard, if the violations alleged under the UCL are distinct from common law fraud. "The fraudulent business practice prong of the UCL has been understood to be distinct from common law fraud." *See also, In re Tobacco II Cases*, 46 Cal.4[th] 298, 312 (2009). "A [common law] fraudulent deception must be actually false, known to be false by the perpetrator and reasonably relied upon by a victim who incurs damages." *Day v. A T & T Corp.*, 63 Cal.App.4th 325, 332 (1998). "None of these elements are required to state a claim for injunctive relief" under the UCL. *See State Farm Fire & Cas. Co. v. Super. Ct.*, 45 Cal.App.4th 1093, 1105 (1996).

This distinction reflects the UCL's focus on the defendant's conduct, rather than the plaintiff's damages, in service of the statute's larger purpose of protecting the general public against unscrupulous business practices. *Fletcher v. Sec. Pac. Nat'l Bank*, 23 Cal.3d 442, 453 (1979).[26] In this sense, the UCL presents a substantively distinct standard from common law fraud and Plaintiffs do not have to meet the pleading requirements of Rule 9(b). *See also, In re Tobacco II Cases*, 46 Cal.4th at 312.

**B.     Plaintiffs Have Standing Under the UCL**

A plaintiff has standing to assert a UCL claim if the complaint alleges (1) a loss of money or property, i.e., some form of economic injury; and (2) injury in fact. *Kwikset Corp. v. Super. Ct.*, 51 Cal.4th 310 (2011). Defendants cite *Arias v. Super. Ct.*, 46 Cal.4th 969, 977-78 (2009) to say that Plaintiffs lack standing to assert a claim under the UCL as they cannot allege the loss of money or property. However, there are numerous ways economic injury can be proven, including "having a present or future property interest diminished" and "be[ing] deprived of money or property to which [plaintiff] has a cognizable claim." *Id.* at 323. An individual may recover profits unfairly obtained to the extent that these profits represent monies given to the defendant or benefits in which the plaintiff has an ownership interest. *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 1148 (2003). Plaintiffs are not required to show specifically what money

---

[26] For example, to state a claim under the UCL for fraudulent marketing or advertising, a plaintiff need merely allege that "members of the public are likely to be deceived" by defendants' conduct. *Comm. on Children's Television, Inc. v. Gen. Foods Corp.*, 35 Cal.3d 197, 211 (1983).

the defendant received as a direct result of the purported wrongful conduct for restitution to be awarded. See *Fletcher v. Sec. Pac. Nat'l Bank*, 23 Cal.3d 442, 450-451 (1979).  Additionally, "that a party may be unable to prove a right to damages does not demonstrate that it lacks standing to argue for its entitlement to them." *Kwikset,* 51 Cal.4th at 336 (quoting *Clayworth v. Pfizer, Inc.,* 49 Cal.4th 758, 789 (2010)).

In this case, the Complaint makes it more than plausible that Defendants' conduct is unlawful in that they have violated the CFAA, CLRA, California's CCL, and California's False Advertising Law as well as the right to privacy articulated in Article I, Section 1 of the California Constitution.  Compl. ¶¶ 187-188.  Further, Plaintiffs have suffered a loss of property and money to which they have a cognizable claim because Defendants obtained Plaintiffs' personal information and supplied such information to advertisers. Thus, defendants stood to receive a pecuniary gain from Plaintiffs' personal information (which has a discernable value in the information marketplace) which can be construed as benefits in which the Plaintiffs have an ownership interest under *Korea*.

*Doe 1 v AOL LLC*, 719 F.Supp.2d 1102, 1113-14 (N.D. Cal. 2010) is factually analogous. In *AOL*, the court considered claims under the UCL brought by plaintiffs whose personal and financial information had been disclosed to the public by AOL, an Internet service provider, in violation of its policy. *Id*. at 1111.  The *AOL* court found that the plaintiffs had standing to assert a UCL claim because they paid AOL for its services and collection and disclosure of their personal information was not something that they bargained for when they signed up and paid fees. *Id*. at 1111-13. Similarly, Plaintiffs in the case *sub judice* have alleged that they paid Apple for the iDevice and that contrary to its disclosures, it enabled highly personal information, including data referring their personal location, to be collected by a third party, the Tracking Defendants.

### C.      Plaintiffs Have Properly Pled Each Prong Of The UCL

The UCL protects both consumers and competitors by promoting fair competition in commercial markets for goods and services. The UCL is "sweeping, embracing anything that can properly be called a business practice and at the same time is forbidden by law." *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal.4th 163, 180 (1999). The UCL prohibits any

unlawful, unfair, or fraudulent business act or practice. A business practice need only meet one of the above three criteria to be considered unfair competition. *Id.*

"Unlawful business acts or practices within the meaning of the UCL include anything that can properly be called a business practice and that at the same time is forbidden by law." *McKell*, 142 Cal.App.4th at 1474 (quoting *Cel-Tech.*, 20 Cal.4th at 180). "A practice is forbidden by law if it violates any law, civil or criminal, statutory or judicially made, federal, state or local." *McKell*, 142 Cal.App.4th at 1474 (citing *Smith v. State Farm Mutual Auto. Ins. Co.*, 93 Cal.App.4th 700, 718 (2001); *Saunders v. Super. Ct.*, 27 Cal.App.4th 832, 838 (1994)). "By extending to business acts or practices which are 'unlawful, the UCL permits violations of other laws to be treated as unfair competition that is independently actionable. Even if the violation of another law does not create a private right of action, if the violation constitutes unfair competition, it is actionable." *McKell*, 142 Cal.App.4th at 1474-75 (quoting *Kasky v. Nike, Inc.*, 27 Cal.4th 939, 949-50 (2002)) (internal quotations omitted).

"A business practice is unfair within the meaning of the UCL if it violates established public policy or if it is immoral, unethical, oppressive or unscrupulous and causes injury to consumers which outweighs its benefits." *McKell*, 142 Cal.App.4th at 1473. To establish an unfair competition claim under the "unfair prong", courts have considered the following factors: (1) the existence of substantial consumer injury; (2) whether the injury is not outweighed by any countervailing benefits to consumers or competition; and (3) whether the injury could not have been reasonably avoided by the consumer. *Camacho v. Auto Club of So. Cal.*, 142 Cal.App.4th 1394, 1403 (2006); *see also Shroyer v. New Cingular Wireless Services*, Inc., 622 F.3d 1035, 1044 (9th Cir. 2010).

To establish an unfair competition claim under the "fraudulent" prong, plaintiffs must show that [the] representations were false or were likely to have misled "reasonable consumers." See *Belton v. Comcast Cable Holdings, LLC*, 151 Cal.App.4th 1224, 1241 (2007). "A fraudulent business practice is one which is likely to deceive the public. It may be based on representations to the public which are untrue, and also those which may be accurate on some level, but will nonetheless tend to mislead or deceive. A perfectly true statement couched in such a manner that

it is likely to mislead or deceive the consumer, such as by failure to disclose other relevant information, is actionable under the UCL." *McKell*, 142 Cal.App.4th at 1471 (citing *Massachusetts Mutual Life Ins. Co. v. Superior Court*, 97 Cal.App.4th 1282, 1290 (2002); *Prata v. Superior Court*, 91 Cal.App.4th 1128, 1137 (2001); *Bank of the West v. Superior Court*, 2 Cal.4th 1254, 1267 (1992)) (internal citations omitted).

Plaintiffs have adequately alleged that Defendants engaged in an "unlawful business practice" because Defendants' conduct runs afoul of the CLRA, California's False Advertising Law, the CFAA, California's Computer Crime Law as well as the right to privacy identified in the California Constitution. Compl. ¶¶187-188. As a result, each of these claims may serve as a predicate violation of the "unlawful" prong of the UCL. Additionally, Plaintiffs alleged that Defendants' conduct was "unlawful" because Defendants improperly divulged Plaintiffs' personal information to third parties without Plaintiffs' consent and under false pretenses.[27] Thus, these violations may serve as predicate violations of the "unlawful" prong of the UCL.

Defendants' conduct satisfies the "unfair prong" because the systematic disclosures of Plaintiffs personal information caused actual harm and could not be avoided when using the device to its full capacity. Defendants' conduct also satisfies the "fraudulent" prong of the UCL because Defendants made various representations in their privacy policy that lead Plaintiffs to believe that their personal information would be safe. Plaintiffs relied on the notion that their information would remain private in deciding to purchase the device and would not have purchased the devices knowing that their personal information would be exposed by these software applications.

Plaintiffs are entitled to recover profits unfairly obtained by Defendants to the extent the profits represent benefits given to the Defendants in which the Plaintiffs have an ownership interest as set forth in *Korea*. Defendants unfairly obtained benefits in which Plaintiffs have an ownership interest because Plaintiff's have an ownership interest in their names and personal

---

[27] Unlike *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1152-53 (9th Cir. 2008) in which the court affirmed dismissal of a UCL claim because the alleged conduct was not independently unlawful, and *Avila v. Countrywide Home Loans*, 2010 WL 5071714, at *6 (N.D. Cal. Dec 7, 2010), in which the court dismissed a UCL claim premised on a violation of an underlying law for which plaintiff had failed to state a claim, in this case Plaintiffs have adequately stated a claims for violations of numerous laws.

1  identifying information, and this information was obtained by Defendants without consent and

2  was released to third parties and advertisers. As a result, Defendants stood to receive a pecuniary

3  benefit from advertisers.

4  **VIII.  PLAINTIFFS HAVE PROPERLY STATED A CLAIM UNDER THE CLRA**

5         Defendants' attempts to defeat Plaintiffs' CLRA claims must similarly fail.  Defendants'

6  motion incorrectly argues first, that Plaintiffs do not link any specific conduct to a claim under the

7  CLRA and second, that software is neither a "good" nor a "service" within the meaning of the

8  CLRA.

9         The CLRA protects consumers from "unfair methods of competition and unfair or

10 deceptive acts or practices" in connection with the sale or lease of goods and services. Cal. Civ.

11 Code § 1761(d). The statute provides that it "shall be liberally constructed and applied to promote

12 its underlying purposes, which are to protect consumers against unfair and deceptive business

13 practices…" Cal. Civ. Code § 1760.  Thus, a "consumer" who suffers "any damage" as a result of

14 any method, act, or practice prohibited by Section 1770 of the statute may assert a claim under the

15 CLRA. Cal. Civ. Code § 1780(a). The CLRA defines "goods" to include "tangible chattels bought

16 or leased for use primarily for personal, family, or household purposes." Cal. Civ. Code §

17 1761(a).

18        Defendants argue, based on *Ferrington v. McAfee, Inc.*, No. 10-CV-01455-LHK, 2010

19 U.S. Dist. LEXIS 106600 (N.D. Cal. October 5, 2010), that Plaintiffs fail to state a claim because

20 software itself cannot be considered a "good" under the CLRA. In this case, however, Plaintiffs

21 are not making the argument that software constitutes a "good" under the CLRA. To the contrary,

22 Plaintiffs' Complaint alleges that the iOS devices themselves constitute "goods" and that the issue

23 is with the iOS devices themselves (i.e. the iPhone, iPad, and iPod Touch), and the fact that the

24 devices are designed with the knowledge that consumers will download additional software

25 applications to which there are no safeguards to prevent the access to Plaintiffs' personal

26 information. The iDevices themselves, which run the iOS, function as an inseparable package and

27 are designed by Apple to be used in conjunction with one another as part of the Apple user

28 experience. Moreover, a key reason iDevices are used in consumers' daily lives is that Apple

- 40 -

1    designed the devices specifically to be capable of running Apps.

2           Additionally, while courts have failed to find that software itself constitutes a good, in this

3    case, the very nature of the Apps themselves can be considered "services" under the CLRA. Each

4    of the particular Apps in question do in fact provide services such as booking reservations,

5    providing weather forecasts, paying bills, etc. Further, given the statute's directive that it be

6    liberally construed, the Court should resolve any ambiguities about the characterization of

7    Defendants' products in favor of Plaintiffs.

8    **IX.   PLAINTIFFS HAVE PROPERLY STATED A CLAIM OF TRESPASS TO
          CHATTELS.**

9           The common law of trespass to chattels prohibits the intentional intermeddling with

10   personal property in possession of another which results in the deprivation of the use of the

11   personal property or impairment of the condition, quality, or usefulness of the personal property.

12   Courts have concluded that a Plaintiff can bring a claim for trespass to chattels in various contexts

13   such as the transmission of unsolicited e-mails, search robots, web spiders, and other automated-

14   data-collection and electronic-scraping devices under various states' common laws, including

15   California. See *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404-05 (2d Cir. 2004) (upholding

16   preliminary injunction on claim for trespass to chattels to stop defendant's use of search robots

17   targeting plaintiff's computer systems); *State Analysis, Inc. v. Am. Fin. Servs. Assoc.*, No.

18   1:08cv1333, 2009 WL 855793, *7 (E.D. Va. Mar. 31, 2009); *Southwest Airlines Co. v. Farechase,

19   Inc.*, 318 F.Supp. 2d 435, 442 (N.D. Tex. 2004) (denying motion to dismiss trespass to chattels

20   claim arising from defendant's use of search robots or scraping devices); *Am. Online, Inc. v. Nat'l

21   Health Care Discount, Inc.*, 121 F.Supp. 2d 1255, 1277 (N.D. Iowa 2000); *eBay Inc. v. Bidder's

22   Edge, Inc.*, 100 F.Supp. 2d 1058, 1064-73 (N.D. Cal. 2000) (enjoining access to eBay's computer

23   systems via automated querying program without eBay's prior authorization); and *Hotmail Corp.

24   v. Van$ Money Pie, Inc.*, No. C98-20064 JW, 1998 WL 388389, *7 (N.D. Cal. Apr. 16, 1998)

25   (bulk spam e-mail constituted trespass to chattels).

26          Although evidence of any burden or harm to a computer system may be imprecise,

27   "evidence of mere possessory interference is sufficient to demonstrate the quantum of harm

28   necessary to establish a claim for trespass to chattels. *Register.com, Inc. v. Verio, Inc.*, 126

- 41 -

F.Supp. 2d 238, 250 (S.D.N.Y. 2000), aff'd, 356 F.3d 393 (2d Cir. 2004). Furthermore, physical dispossessions of a chattel is not required to state a claim for trespass to chattels where the quality, condition, or value of the computer services were harmed as a result of defendant's conduct. *CompuServe Inc. v. Cyber Promotions, Inc.*, 962 F.Supp. 1015, 1021-24 (S.D. Ohio 1997).

Defendants argue that a trespass to chattels did not occur because Plaintiffs "voluntarily" downloaded the software. However, there was nothing voluntary about Defendants' knowing and intentional access, without Plaintiffs' consent, to Plaintiffs' property, which intermeddled with Plaintiffs' right to exclusive possession of the property, thereby causing injury to Plaintiffs. When Plaintiffs visited Apple's App store and downloaded software, they did not consent to giving Defendants access and control over their mobile devices, which is exactly what happened. Defendants were then able to obtain user's UDID from a tracking code on the user's mobile device, and use this UDID to obtain mobile browsing activities of the mobile device. The Complaint in Paragraphs 170-177 contains detailed information explaining how Defendants' conduct did, in fact, impair the condition and value of Plaintiffs' mobile devices. Thus, the Complaint alleges in adequate detail how Defendants' conduct constituted a trespass to chattels by intentionally intermeddling with personal property in possession of another, which resulted in the deprivation of the use of the personal property and impairment of the condition, quality, or usefulness of the personal property—namely Plaintiffs and Class Members' iDevices.

## X.   PLAINTIFFS HAVE PROPERLY ALLEGED A RIGHT TO THE RELIEF OF UNJUST ENRICHMENT

Defendants argue that Plaintiffs' unjust enrichment claim should be dismissed *with prejudice* because California does not recognize a cause of action for unjust enrichment as an independent claim, and Defendants did not receive any money or property from Plaintiffs. Contrary to Defendants' bald assertion, unjust enrichment is a vehicle through which California courts have allowed litigants to seek restitution. See e.g. *SOAProjects Inc. v. SCM Microsystems, Inc.*, 2010 WL 5069832 at *9-10 (N.D. Ca. Dec. 7, 2010) (Koh, J.) (noting same). However, Plaintiffs acknowledge that the law in California is less than clear on the viability of an unjust enrichment claim, and that this Court in particular has previously found in another matter that there was no cause of action for unjust enrichment under California law.  *See Ferrington v.*

- 42 -

*McAffee, Inc.*, 2010 WL 3910169 at *17 (N.D. Ca. Oct. 5, 2010) (J. Koh).

Under *Accuimage Diagnostics Corp v. Terarecon, Inc.*, 260 F.Supp.2d 941, 958 (N.D. Cal. 2003), Plaintiffs have sufficiently stated a cause of action for unjust enrichment by alleging that Defendants received a benefit, and unjust retention of the benefit at the expense of plaintiff.[28]  The term "benefit" has been interpreted so as to "denote any form of advantage." *Id.* Additionally, courts have found that a plaintiff who is not claiming relief under theories of contract is not precluded from making a claim for unjust enrichment under common law theories. See *Oestreicher v. Alienware Corp.*, 544 F.Supp.2d 964, 975 (N.D. Cal. 2008).

However, if and to the extent, this Court deems the pleading insufficient and finds unjust enrichment to be merely an equitable remedy and not an independent claim for relief, Plaintiffs should be given the opportunity to address the Court's concerns with leave to clarify our demand for relief. "[L]eave to amend should be granted unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986).

## XI.    PLAINTIFFS SUFFICIENTLY PLEAD NEGLIGENCE AGAINST APPLE

In a transparent slippery slope argument, Apple complains that Plaintiffs seek to impose upon it "a generalized warranty of unimpeachable developer and third party conduct" (Apple Mem. at 12) and "a duty to guarantee that app developers and companies with whom they do business will not misuse information about App Store users." (*Id.* at 13).    This is incorrect. Plaintiffs merely ask the Court to recognize that Apple must adhere to the same standard of care imposed on anyone who undertakes actions which could result in foreseeable harm to others – the duty to act with reasonable care to avoid that harm.

### A.    Apple Has a Duty of Reasonable Care that Arises Independent of Its Contracts

Hoping to sufficiently muddy the waters and conflate the two issues, Apple confidently

---

[28] Defendants knowingly obtained benefits from Plaintiffs' under circumstances that constituted unjust enrichment. Defendants knowingly used Plaintiffs' personal information without their knowledge or consent to gain commercial advantage from third-parties and had full knowledge of the benefits they received from Plaintiffs. Defendants will be unjustly enriched if Defendants are permitted to retain the money paid to them by third-parties, or resulting from the commercial advantage they gained, in exchange for Plaintiffs' personal information

1   asserts that because it has a contractual relationship with Plaintiffs, it can never be held liable in

2   tort for its actions.  Apple is simply wrong.  While it is true that mere "omission to perform a

3   contract obligation is never a tort," it is equally true that such an omission is a tort when "that

4   omission is also an omission of a legal duty."  *Applied Equip. Corp. v. Litton Saudi Arabia Ltd*., 7

5   Cal.4th 503, 515 (1994).

6                   **1.      Duty to Perform Contract with Care and Skill**

7        It is well established under California law that:

8            [a]ccompanying every contract is a common-law duty to perform with care, skill,
             reasonable expedience, and faithfulness the thing agreed to be done, and a
9            negligent failure to observe any of these conditions is a tort, as well as a breach of
             the contract.  The rule which imposes this duty is of universal application as to all
10           persons who by contract undertake professional or other business engagements
             requiring the exercise of care, skill and knowledge; the obligation is implied by law
11           and need not be stated in the agreement.

12   *N. Am. Chemical Co. v. Sup. Ct.*, 59 Cal.App.4th 764, 774 (1997) (internal quotes omitted).  In

13   fact, "the same wrongful act may constitute both a breach of contract and an invasion of an

14   interest protected by the law of torts."  See *Id. Moreno v. Sanchez,* 106 Cal.App.4th 1415, 1435

15   (2003) ("Under the common law the established rule is the negligent failure to exercise reasonable

16   care and skill in undertaking to perform a service contract of this type is a tort, as well as a breach

17   of contract.").

18        Here, Apple's App Store can only be described as a service.  In the first paragraph of the

19   App Store's Terms and Conditions, it is described as "Services" and is variously described as "the

20   Services" throughout.  (*See* McCabe Declaration, Exhibit F, Dkt. No. 143-6.)  Through its App

21   Store service, Apple exercises complete control over the types of software that Plaintiffs can put

22   on their iDevices.   Such control includes: 1) approval and sale of Apps in the only App

23   marketplace Apple allows (Compl. ¶ 38); 2) requiring all Apps to enter and abide by Apple's form

24   iOS Developer Agreement (*Id*.); 3) requiring that developers buy and use Apple's software

25   development kit and providing highly detailed guidelines for App development (*Id*., at ¶ 47); 4)

26   digitally signing all Apps (*Id*., at ¶ 52); 5) claiming to offer only Apps it has reviewed and found

27   safe and appropriate (*Id*., at ¶ 38); and 6) representing to its consumers that it does not permit

28   Apps that "violate[] our developer guidelines," such as Apps that contain pornography, violate

consumer privacy, or "hog" bandwidth (*Id.*, ¶¶ 3, 38 and Fig. 1.).

Taken together, each of these factors requires a great deal of care and skill. Apple has a duty in providing its App Store services to exercise that care and skill in a reasonable manner. The negligent failure to do so constitutes a tort. Although this duty arises out of a contractual relationship, its violation sounds in negligence.

## 2. Duty to Use Ordinary Care to Avoid Harm

Apple, like everyone else, shares the duty to use ordinary care to prevent others from being injured as the result of its conduct. *Weirum v. RKO Gen., Inc.*, 15 Cal.3d 40, 46 (1975) ("every case is governed by the rule of general application that all persons are required to use ordinary care to prevent others from being injured as the result of their conduct."); *See also* Cal. Civ. Code § 1708 ("Every person is bound, without contract, to abstain from injuring the person or property of another, or infringing upon any of his or her rights."). Foreseeability of the "risk of harm is a primary consideration in establishing the element of such a common law duty." *Weirum* at 46. Societal policy factors, however, also play a part. See *Erlich v. Menezes*, 21 Cal.4th 543 (1999) (refusing to allow emotional distress damages for negligent performance of a contract because of the burden that allowance of such damages would have on commerce). While the issue of whether a duty is owed is a question of law for the Court, foreseeability is generally a fact question for the jury. *Id.* Further, it is not a defense that some of the harms to Plaintiffs were caused, in part, by the actions of third parties. *Id.* at 47 ("If the likelihood that a third person may react in a particular manner is a hazard which makes the actor negligent, such reaction whether innocent or negligent does not prevent the actor from being liable for the harm caused thereby.").

Plaintiffs plead that it was foreseeable to Apple that Plaintiffs could be harmed by having their personal information obtained by the Tracking Defendants and used to mine Plaintiffs' private data. Specifically, Plaintiffs plead that: 1) Apple internally treats information such as users' device ID (UDID) as personal information (recognizing the harm that might occur if such information was used to personally identify Plaintiffs) (Compl. ¶ 60); 2) Apple amended its Developer Agreement to specifically prohibit Apps from sending private information to third parties without express consent from the user (although it never actually enforced the change) (*Id.*,

at ¶ 48); and 3)  Apple has exercised discretion in banning certain Apps from its App Store for violating uses privacy rights.  *Id*.

Thus, it is clear that it was foreseeable to Apple that its customers could be harmed by third parties taking their personal information. Because such harm to its customers was foreseeable, Apple had a duty to use reasonable care to avoid this harm both in the design of its iOS operating system and in the administration of its App Store. This duty is independent of Apple's contractual duties and is therefore not a "mere negligent breach of a contract" as discussed in *Erlich*, 21 Cal.4th at 552.  Apple's duty was a common law duty arising solely from tort principals. See *Neubauer v. Circuit City Stores, Inc.,* G032942, 2004 WL 2861674 (Cal. Ct. App. Dec. 14, 2004)("Circuit City seems to argue that *Erlich v. Menezes* (1999) 21 Cal.4th 543 stands for the proposition that a breach of contract can never give rise to a tort action, overruling North American Chemical. We do not read the case that way. . . .  The general duty to exercise due care always exists independently of the contract").

### 3.    Apple Undertook a Duty and Had a Duty to Act with Reasonable Care

"Firmly rooted in the common law lies the concept that although one individual need do nothing to rescue another from peril not of that individual's own making, nevertheless, '(h)e who undertakes to do an act must do it with reasonable care.'" *Schwartz v. Helms Bakery Ltd.,* 67 Cal.2d 232, 238 (1967).  A defendant's undertaking will support the finding of a duty to another if:  (a) the defendant's action increased the risk of harm to another, or (b) the other person reasonably relied upon the undertaking to his or her detriment. *Delgado v. Trax Bar & Grill*, 36 Cal.4th 224, 250 (2005).

Apple, having exercised total control over the entire Apple user experience and App approval process, undertook a duty to protect Plaintiffs from harmful actions caused by the use of Apps, and had an obligation to use reasonable care to prevent such harm.  Apple's exercise of such control over the Apps is part of Apple's "complete control of the users' experience." (Compl. ¶¶ 1-7.)  Apple further undertook that duty by barring Aurora Feint and others from its App Store for suspected harm to customers.  (*Id*., at ¶ 65.)  It was reasonable for Plaintiffs and the Class Members to rely on this undertaking of control to their detriment.  Therefore Apple, haven

- 46 -

1   undertaken that duty, had to exercise reasonable care in setting rules and procedures to ban other

2   Apps from its marketplace which were being used to mine Plaintiffs' personal data.

### 4.   Apple Had a Special Relationship with Plaintiffs

4        While generally a party has no duty to control or prevent the actions of third parties, such a

5   duty can arise where: "(a) a special relation exists between the actor and the third person which

6   imposes a duty upon the actor to control the third person's conduct, or (b) a special relation exists

7   between the actor and the other which gives to the other a right to protection." *See* Restatement

8   (Second) of Torts § 315 (1965); *Delgadol*, 36 Cal.4th at 235 (The law imposes a duty on those in

9   special relationship with either the harming or harmed person.).   Courts have found such a special

10  relationship in cases involving the relationship between business proprietors such as shopping

11  centers, restaurants, and bars, and their tenants, patrons, or invitees.  *Id.*  This relationship is based

12  on foreseeability of harm.   The greater the likelihood and severity of harm, the more likely the

13  duty to protect will be imposed.[29]

14       Here, Apple had a special relationship with Plaintiffs that required it to act.  Apple's App

15  Store is functionally no different from any other business establishment.   In fact, Apple has so

16  restricted its iDevices and access to its App Store that users have no choice regarding where they

17  purchase Apps for their iDevices or the types of Apps that are available in the App Store.

18  (Compl. ¶ 38.)  Under these circumstances, when it is forseeable that Apps are being used by the

19  Tracking Defendants to access sensitive and private information about its customers, Apple has a

20  duty to warn its customers of these activities and to take reasonable steps to prevent it.  This is

21  especially true where, as here, Apple participated in creating the harm in the first place by

22  designing its iDevices to be so vulnerable to this practice.

23       Plaintiffs adequately plead that Apple knew of this practice, knew of its severity,

24  purportedly attempted to stop the practice, unreasonably stopped short of doing so, and never

25  advised Plaintiffs of this danger. (Compl. ¶¶ 48, 65, 66, 67, 71, 72, and 73.)  Apple clearly owed a

26  duty to protect Plaintiffs because of the special relationship between itself (the proprietor of the

---

27  [29] This duty is not tied to land ownership and has been applied to a restaurant owner to assist with choking patrons and to bar owners to call 911 or the police to protect their patrons from unruly
28  customers.  *Id*

marketplace) and its customers.

**B.      Apple Breached its Standard of Care**

Plaintiffs identify numerous ways in which Apple breached its duty of reasonable care, including:

> "Apple breached its duty by designing iDevices so that the Tracking Defendants could acquire personal information without consumers' knowledge or permission, by failing to review and remove privacy-violating apps from the App Store, and by constructing and controlling consumers' user experience and mobile environment so that consumers could not reasonably avoid such privacy-affecting actions."

(Compl. ¶ 115.) In turn, the factual basis for those assertions include: Apple's assumption of complete control over its customers' computing experience, including designing its iDevices to allow Apps such easy and unfettered access to a vast array of sensitive user data and failing to take reasonable steps to allow users to restrict access to this information.  (*Id.*, at ¶¶ 1-7.) Plaintiffs also adequately describe Apple's failure to take reasonable care to monitor the activities of Apps and how they allow Tracking Defendants to take such sensitive data from Plaintiffs' iDevices.  (*Id.*, at ¶¶ 49-60, 117 and 118.)   These allegations adequately establish Apple's negligence.

**C.      Plaintiffs Have Established Harm**

Unlike the cases cited by Apple, Plaintiffs here assert current harm and are not merely complaining about the risk of future harm.  (*See e.g., supra,* Section I, A.).

**XII.   DAMAGES ARE NOT PRECLUDED BY THE SO-CALLED ECONOMIC LOSS DOCTRINE**

The so-called economic loss rule implicates the crossroads between tort and contract law and merely serves as cross check to ensure that the two realms do not overlap.  Contract law seeks to put the plaintiff in the position he or she would have been in had the contract been performed.  Tort law, on the other hand, seeks to make the plaintiff whole, as if the defendants' harmful actions had never occurred.  Therefore, a party merely seeking damages for not getting the benefit of its bargain, *i.e.,* for damage to a product he or she purchased, must sue in contract, not tort. *Robinson Helicopter Co., Inc. v. Dana Corp.*, 34 Cal.4th 979, 988 (2004) ("[W]here a purchaser's expectations in a sale are frustrated because the product he bought is not working properly, his remedy is said to be in contract alone").

1   Damages for loss of profits or earnings are recoverable where they result from an injury to

2   one's person or property caused by another's negligence. *Id.*  Therefore, a plaintiff suing for

3   damage to himself or damage caused to other property, can sue in tort.  As outlined above,

4   Plaintiffs assert several types of damages that can all be fairly characterized as either invasions of

5   their legally protected rights by having something of value taken from them or damage to the

6   value of their private information.  Each of these claims involve damages other than to the product

7   itself, Plaintiffs' iDevices, which under some circumstances, could be prohibited by the economic

8   loss doctrine.

9   Courts have also held, however, that even damages that would ordinarily be precluded by

10  the economic loss rule are allowable for contracts involving services where a "special

11  relationship" is involved. *N. Am. Chem. Co, supra,* 59 Cal.App.4th at 783.  Determining whether

12  the necessary "special relationship" is present involves evaluation of six factors:

13  (1) the extent to which the transaction was intended to affect the plaintiff, (2) the
    foreseeability of harm to the plaintiff, (3) the degree of certainty that the plaintiff suffered
14  injury, (4) the closeness of the connection between the defendant's conduct and the injury
    suffered, (5) the moral blame attached to the defendant's conduct, and (6) the policy of
15  preventing future harm.

16  *Id. citing J'Aire Corp. v . Gregory,* 24 Cal.3d 799, 804 (1979).  This doctrine applies even when

17  the parties are in contractual privity.  *N. Am. Chem Co.*, at 783.

18  Plaintiffs allege negligence by Apple in administering its App Store service that meets

19  each of these criteria.  As has been discussed extensively in previous sections, the harm involved

20  was not only foreseeable, but was actually foreseen by Apple.  Had Apple acted, the harm to

21  Plaintiffs could have been directly avoided.  Plaintiffs suffered injury.  Apple's actions lie directly

22  at the heart of Plaintiffs' injuries.  Finally, Apple is in the best position to avoid future harm, as it

23  already acts to monitor and restrict App's entrance to the App Store, albeit in a negligent way.

24  Based on each of these factors, as well as for the reasons stated earlier, Apple has a special

25  relationship with the customers of its App store which allow recovery of damages that might

26  otherwise have been prohibited by the economic damages rule.

27  For each of these reasons, Plaintiffs identify a duty of reasonable care owed by Apple to

28  Plaintiffs, its customers.  Plaintiffs identify how Apple's actions fell below that standard of care,

1   and how Apple's actions caused specific, current harm to Plaintiffs, which does not run afoul of

2   the economic loss doctrine.  Apple's Motion should be denied as to this cause of action.

3   **XIII.  APPLE BREACHED ITS DUTY OF GOOD FAITH AND FAIR DEALING**

4           In California, there is implied in every contract a covenant of good faith and fair dealing

5   which requires that neither party do anything that will deprive the other of the benefits of the

6   contract.   *Chodos v. W. Publ'g Co.*, 292 F.3d 992, 996-97 (9th Cir. 2002).   Apple cites

7   *Kinderstart.com, LLC v. Google, Inc.*, No. C06-2057 JF (RS), 2006 WL 3246596, at *12 (N.D.

8   Cal. July 13, 2006) for the proposition that Apple cannot be held liable because Apple

9   "disclaim[s] liability for the information privacy practices of the app developers with whom users

10  do business."  As explained earlier, Apple's attempts to disclaim liability and responsibility are

11  unconscionable and unenforceable.   Without those disclaimers, *Kinderstart.com* has no

12  application.  Furthermore, *Kinderstart.com* merely stands for the proposition that a party does not

13  have to take actions which are not required by the contract in order to satisfy its implied covenant

14  of good faith and fair dealing.  It does not absolve a party of the duty to refrain from acting

15  intentionally to thwart benefits directly bestowed by the contract.  Here, Plaintiffs allege that

16  Apple: 1) exercised "bad faith in using its discretionary rights to deliberately, routinely, and

17  systematically make Plaintiffs' personal information available to third parties"; 2)  "deliberately,

18  routinely, and systematically without notifying Plaintiffs' of its disclosure of Plaintiffs' personal

19  information to Tracking Defendants"; 3) failing to "obtain Plaintiffs' consent in data mining

20  efforts while at the same time consciously and deliberately facilitating data mining to

21  automatically and without notice provide user information the Tracking Defendants"; and 4)

22  profiting "from advertising revenues derived from its data mining efforts from Plaintiffs and the

23  Class." (Compl. ¶¶ 201-203.) These are all intentional acts designed to thwart direct benefits of

24  Plaintiffs' contract with Apple – provision of safe and secure Apps for their iDevices.  Such

25  actions by Apple violate its implied covenant of good faith and fair dealing.

    ## CONCLUSION

26          Plaintiffs respectfully request that the Motions to Dismiss be denied, or in the alternative,

27  if the Motions are Granted, that they be granted without prejudice, and Plaintiffs given an

28  opportunity to replead.

1

2

3   Dated: July 18, 2011                          Respectfully submitted,

4                                                  KAMBERLAW, LLC

5

6                                                  By:____s/Scott A. Kamber_____

7                                                      Scott A. Kamber, Interim Class Counsel

8   SCOTT A. KAMBER
    DAVID A. STAMPLEY
9   GRACE PARASMO
    skamber@kamberlaw.com
10  dstampley@kamberlaw.com
    gparasmo@kamberlaw.com
11  KAMBERLAW, LLC
    100 Wall Street, 23rd Floor
12  New York, New York 10005
    Telephone:  (212) 920-3072
13  Facsimile:   (212) 202-6364

14  DEBORAH KRAVITZ
    dkravitz@kamberlaw.com
15  KAMBERLAW, LLP
    141 North Street
16  Healdsburg, CA 95448
    Telephone: (707) 820-4247
17  Facsimile:   (212) 202-6364

18  Interim Class Counsel for Consolidated Plaintiffs

19
    WILLIAM AUDET
20  JONAS P. MANN
    MICHAEL A. MCSHANE
21  AUDET & PARTNERS LLP
    221 Main Street, Suite 1460
22  San Francisco, California 94105
    Telephone: (415) 568-2555
23  Facsimile: (415) 568-2556

24  Liaison Counsel for Consolidated Plaintiffs

25

26

27  ROBERT K. SHELQUIST
    rshelquist@locklaw.com
28  LOCKRIDGE GRINDAL NAUEN P.L.L.P.
    100 Washington Avenue S., Suite 2200

Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981


JEFF S. WESTERMAN
jwesterman@milberg.com
MILBERG LLP
One California Plaza
300 S. Grand Avenue, Suite 3900
Los Angeles, CA 90071
Telephone: (213) 617-1200
Facsimile:  (213) 617-1975


JEREMY WILSON
jeremy@wtlfirm.com
WILSON TROSCLAIR & LOVINS
302 N. Market Street, Suite 501
Dallas, Texas 75202
Telephone: (214) 430-1930

Executive Committee for Consolidated Plaintiffs